**INLAND STEEL BAR CO., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**United Engineering Steels, Ltd., Defendant–Intervenor.**

**Court No. 93–04–00234.**
**Slip Op. 94–93.**

United States Court of International Trade.

June 7, 1994.

180

Wiley, Rein & Fielding, Charles Owen Verrill, Jr., Alan H. Price, Beth A. Kurowski, and Brian E. Rosen, Washington, DC, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Civil Div., Commercial Litigation Branch, U.S. Dept. of Justice, Jeffrey M. Telep, Elizabeth Seastrum, and Robert E. Nielsen, Sr. Atty., Office of Chief Counsel, Washington, DC, for Import Admin., U.S. Dept. of Commerce, of counsel, for defendant.

Steptoe & Johnson, Richard O. Cunningham, Sheldon E. Hochberg, William L. Martin, II, Elizabeth B. Echols, Peter Rafter and Peter Lichtenbaum, Washington, DC, for defendant-intervenor.

Morgan, Lewis & Bockius, Mark R. Joelson and Marcela B. Stras, Washington, DC, for amicus curiae the Government of the United Kingdom.

## OPINION

CARMAN, Judge:

Plaintiff and defendant-intervenor contest the U.S. Department of Commerce's (Commerce) determination in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom*, 58 Fed.Reg. 6237 (Dep't Comm.1993) (final determination) (*Final Determination*), as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom* (1993) (*Remand Determination*). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

Commerce's period of investigation for United Engineering Steels, Ltd. (UES) is calendar year 1991. *Final Determination*, 58 Fed.Reg. at 6238. The products covered by Commerce's investigation are "hot-rolled bars and rods of non-alloy or other alloy steel, whether or not descaled, containing by weight 0.03 percent or more of lead or 0.05 percent or more of bismuth, in coils or cut lengths, and in numerous shapes and sizes." *Id.*

The government of the United Kingdom (U.K.) provided subsidies to the state-owned British Steel Corporation (BSC) from 1978 until 1986. In 1986, BSC and Guest, Keen & Nettlefolds (GKN), a privately-owned company, formed a joint venture company, United Engineering Steel Corporation (UES). *Id.* In return for shares in UES, BSC and GKN each contributed productive units—BSC's Special Steels Business and GKN's Brymbo Steel Works, accounts receivable, cash and inventories to the joint venture. *Id.* At the time UES was formed, BSC was wholly owned by the U.K. In 1988, however, BSC was privatized and is now known as British Steel plc. *Id.*

Pursuant to a petition filed by Inland Steel Corporation and Bethlehem Steel Corporation, Commerce initiated an investigation on May 8, 1992, and issued its preliminary determination on September 17, 1992. *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Brazil, France, Germany, and the United Kingdom,* 57 Fed.Reg. 19,884 (Dep't Comm.1992) (initiation notice); *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom,* 57 Fed.Reg. 42,974 (Dep't Comm.1992) (prelim. determination). In its *Final Determination,* published on January 27, 1993, Commerce determined "a company's sale of a 'business' or 'productive unit' does not alter the effect of previously bestowed subsidies." 58 Fed.Reg. at 6240. Commerce concluded, therefore, "a portion of the pre–1986 subsi-

dies provided to BSC passed through to the Special Steels Business at its new 'home,' UES." *Id.* Commerce reached this conclusion despite its finding that UES is "an independent joint venture company, managed as a separate corporate entity from its parent companies BSC ... and GKN," and was "created after several years of difficult, arm's length negotiations between BSC and GKN." *Id.*

Although BSC and GKN each hold a 50% interest in UES, Commerce found nothing in the minutes of UES' board meetings indicating BSC dominated the board meetings. *Id.* Commerce further noted BSC had fewer representatives on UES' board and committee than did GKN and that in 1988 BSC did not exercise its right to appoint the chairman of the board. *Id.* Based on this information and the fact UES paid BSC market prices for raw materials, Commerce concluded "UES is a separate corporate entity and not controlled by BSC." *Id.* With respect to subsidies received by BSC after the formation of UES, Commerce stated unequivocally "any benefits received by BSC after formation of the joint venture do not pass through to UES." *Id.* at 6241. Subsequent to the International Trade Commission's affirmative injury determination, Commerce issued a countervailing duty (CVD) order for the relevant products. *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom,* 58 Fed.Reg. 15,327 (Dep't Comm.1993) (CVD order).

Prior to briefing, Commerce requested and was granted a remand to reconsider its original determination. On remand, Commerce adopted its reasoning from *Certain Steel Products from the United Kingdom,* 58 Fed. Reg. 37,393 (Dep't Comm.1993) (final determination) (*Certain Steel* ). Commerce "reanalyzed the spin-off of BSC's Special Steels Business and applied the methodology articulated in the *Restructuring* section of the General Issues Appendix[, 58 Fed.Reg. 37,-225, 37,259 (Dep't Comm.1993) ]." *Remand Determination* at 2. Based on *Certain Steel* and the General Issues Appendix, Commerce concluded "the purchase price for all or part of a government-owned company can, at least in part, constitute repayment of prior subsi-

dies." *Remand Determination* at 1–2. In the original final determination Commerce found CVD margins of 12.69%, and in the subsequent remand determination Commerce found CVD margins of 4.59%. *Final Determination,* 58 Fed.Reg. at 6246; *Remand Determination* at 4.

Subsequent to remand, UES sought an order requiring Commerce to correct the cash deposit rates and refund excess cash deposits. The Court denied UES' motion holding that "[a]lthough Commerce has determined on remand the cash deposit rate on UES' merchandise should be 4.59%, the correct deposit rate is still at issue in the underlying action." *Inland Steel Bar Co. v. United States,* 18 CIT ——, ——, 843 F.Supp. 1477, 1479 (1994). The Court further stated because it had "not issued its final judgment in this case with respect to the cash deposit rate, it would be contrary to law for this Court to grant UES motion." *Id.* at ——, 843 F.Supp. at 1479.

## CONTENTIONS OF THE PARTIES

UES argues Commerce unlawfully determined subsidies received by BSC should be attributed in part to UES. According to UES, Commerce failed to provide a rational basis for its decision to impose countervailing duties on UES' production. The Amicus curiae, the U.K., supports UES' position. The U.K. argues Commerce's travelling subsidy methodology is contrary to U.S. CVD law, GATT and the Subsidies Code. If the Court holds Commerce properly attributed subsidies to UES, then UES contends Commerce properly allocated the subsidies based on relative assets but erred in amortizing those subsidies over a period of fifteen years.

Commerce contends it properly determined subsidies received by BSC travelled with the Specialty Steels Business to UES. With respect to the amortization period, Commerce claims it properly relied on the average useful life of assets in the steel industry, a figure which is based on the class life depreciation tables in the U.S. tax code. Moreover, Commerce maintains it properly allocated the subsidies based on relative assets. According to Commerce, nothing in the CVD law directs it how to allocate subsi-

dies when a subsidized, state-owned company privatizes one of its productive units. Commerce argues, therefore, its use of relative assets for this allocation was a reasonable exercise of its authority.

Inland supports Commerce's determination imposing countervailing duties on UES' production for subsidies received by BSC. Inland also agrees with Commerce's use of the fifteen-year amortization period and maintains it is a reasonable and rationale method. Contrary to Commerce's determination, however, Inland argues Commerce should not have reallocated subsidies back to BSC from UES on remand. Additionally, Inland disagrees with Commerce's allocation of subsidies based on relative assets rather than relative sales.

## STANDARD OF REVIEW

The appropriate standard for the Court's review of a final determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

■■■ The Court must accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). While Commerce has discretion in choosing one methodology over another, however, "[t]he traditional deference courts pay to agency interpretations is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), *cited in British Steel Corp. v. United States,* 10 CIT 224, 235, 632 F.Supp. 59, 68 (1986); *see also Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966 (The agency must not "contravene or ignore the intent of

the legislature or the guiding purpose of the statute.") (citations omitted).

## DISCUSSION

### A. *Sale of the Special Steels Business*

■■■ Contrary to Commerce's findings, Inland maintains the transfer of the Special Steels Business was not a transaction between unrelated parties, was not an arm's-length transaction, and was not done on the basis of market value. Commerce refutes Inland's claim that the sale of the Special Steels Business was simply "corporate restructuring" by pointing to the substantial evidence on the record supporting its determination. UES supports Commerce's position, arguing Commerce's determination pertaining to this issue is based on substantial evidence on the record and is otherwise in accordance with law.

The Court finds Inland's argument to be without merit. Commerce reviewed the minutes of UES' board meetings and records of exchanges of materials between UES and BSC. *Final Determination,* 58 Fed.Reg. at 6240. This review indicated BSC did not dominate board meetings, had fewer representatives on UES' board than GKN, and used market prices for commercial transactions between it and UES. *Id.* Additionally, Commerce found "UES was created after several years of difficult, arm's length negotiations between BSC and GKN," and "found nothing during verification which indicate[d] that the negotiations for UES were not held at arm's length." *Id.* These facts compel the Court to hold Commerce's determination that the sale of the Special Steels Business was an arm's length transaction by unrelated parties at market rates was based on substantial evidence on the record and is otherwise in accordance with law.

### B. *Attribution of Subsidies to UES*

■■■ The Court now turns to the second issue, whether Commerce properly determined subsidies previously bestowed upon BSC could be attributed to UES after UES was created in an arm's length transaction. Although there is no dispute that the U.K. bestowed subsidies within the meaning of 19

U.S.C. § 1677(5) (1988) upon BSC, the U.K. did not provide any such subsidies directly to UES. Thus, if the attribution of BSC's subsidies to UES is unlawful, then no countervailable event has occurred within the meaning of 19 U.S.C. § 1671(a) (1988). Based on the reasons which will be discussed below, the Court holds Commerce erred as a matter of law in determining subsidies previously bestowed upon BSC can be attributed to UES.

In 1993, Commerce developed and published a methodology for analyzing the privatization of some or all of a government-owned company. General Issues Appendix, 58 Fed. Reg. at 37,259. Commerce decided to use this methodology to analyze the spin-off and acquisition of productive units such as the Special Steels Business in order to be consistent with its position pertaining to privatization. *Id.* at 37,269. Commerce stated CVD law required it "to countervail an allocated share of the subsidies received by producers, regardless of their effect." *Id.* at 37,260. According to Commerce, therefore, it is irrelevant "whether subsidies confer a demonstrable competitive benefit upon their recipients, in the year of receipt or any subsequent year." *Id.* In rejecting arguments that privatization automatically extinguishes prior subsidies, Commerce concluded such arguments are contrary to CVD law because

> the countervailable subsidy (and the amount of the subsidy to be allocated over time) is fixed at the time the government provides the subsidy. The privatization of a government-owned company, *per se,* does not and cannot eliminate this countervailability.... [T]he statute does not permit the amount of the subsidy, including the allocated subsidy stream, to be reevaluated based upon subsequent events in the marketplace.

*Id.* at 37,263.

Based on Commerce's methodology, privatization does not extinguish subsidies, but "[i]nstead, some portion of prior subsidies received by the seller 'travel[s] (with the

productive unit) to is new home.' "[1] *Id.* at 37,268. Despite maintaining CVD law does not permit it to determine how subsequent events affect the subsidy stream, Commerce stated it "will analyze the spin-off and acquisition of productive units to assess what portion of the sale price of the productive unit repays prior subsidies given to the seller of the productive unit." *Id.* at 37,269.

UES complains it never received any subsidies from the U.K. and Commerce has failed to show why subsidies previously received by BSC should be attributed to UES. UES argues because the ITA found it to be an independent joint venture, subsidies given to BSC may not be attributed to UES. According to UES, Commerce merely concluded, without any supporting rationale, that subsidies travel with productive assets. UES contends that when a subsidy recipient such as BSC sells its productive facilities to an independent company such as UES, the benefits of operating with subsidized capital remain with the seller. UES claims Commerce's argument, that the CVD laws will be circumvented when a "bubble" of subsidies ends up in an empty corporate shell, amounts to a penal, rather than remedial, view of the CVD laws. UES points out that if an entity sells its productive units and no longer exports to the United States, then it is of no concern to Commerce that this entity continues to benefit from the subsidies. Moreover, UES maintains there is no evidence that BSC or UES tried to circumvent CVD law by shifting productive units from one entity to another.

Commerce argues because the CVD statute requires it to identify and measure subsidies when a company receives them, it does not take into consideration subsequent events like privatization. Commerce maintains CVD law does not mandate that it determine the competitive benefit, if any, resulting from receipt of a subsidy and need not calculate, therefore, the remaining competitive benefit, if any, UES received. Additionally, Commerce indicates its concern that

---

**1.** Commerce established a minimum threshold for allocating subsidies because it determined it would be administratively infeasible to allocate subsidies to each individual asset. "In order to

be considered a productive unit, the spun-off operation must be capable of (1) generating sales and (2) operating independently." *Id.* at 37,268.

recipients of subsidies could circumvent CVD law by simply selling off productive units.

Inland contends Commerce properly found the subsidies allocable to a productive unit travel with the unit to its new home. Inland agrees with Commerce that where an entire operating business is transferred to a buyer and the production of the benefitted merchandise continues without interruption, the buyer must pay a CVD. According to Inland, the Special Steels Business continued to benefit from the subsidies after the transfer from BSC to UES. Moreover, Inland claims nothing in the CVD statute allows reduction or termination of the countervailability of a subsidy merely because corporate ownership changes.

■ Before a CVD can be imposed, Commerce and the International Trade Commission (ITC) must make certain findings. Once Commerce determines that

> **(A)** a country under the Agreement, or
>
> **(B)** a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,
>
> is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States, and [the ITC makes an affirmative injury determination],
>
> then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy.

19 U.S.C. § 1671(a). In determining whether a given item is a subsidy, Commerce is guided by 19 U.S.C. § 1677(5)(A). Absent a finding that a subsidy within the meaning of § 1677(5)(A) is being provided, directly or indirectly, no countervailing duty can be assessed pursuant to § 1671(a). Because no subsidy was provided directly to UES, the remaining question is whether UES indirectly received the benefit of BSC's previously bestowed subsidies.

■ This Court concludes UES did not indirectly receive the benefit of BSC's earlier subsidies. Where Commerce determines a given transaction is at arm's length, "one must conclude that the buyer and seller have negotiated in their respective self-interests, the buyer has taken into consideration all relevant facts, and the buyer has paid an amount which represents the market value of all it is to receive." *Saarstahl, AG v. United States,* 18 CIT ——, ——, 858 F.Supp. 187, 193 (1994). In the instant action, Commerce determined "UES was created after several years of difficult, *arm's length negotiations* between BSC and GKN." *Final Determination,* 58 Fed.Reg. at 6240 (emphasis added). In fact, Commerce "found *nothing* during verification which indicates that the negotiations for UES were not held at arm's length." *Id.* (emphasis added). After reviewing the "many elements of the negotiations," Commerce concluded that "the package viewed in its entirety represented *an arm's length transaction* in which BSC acted consistently with commercial considerations." *Id.* at 6244 (emphasis added).

Furthermore, Commerce did not find in either the *Final Determination* or *Remand Determination* that a discount was granted in the purchase price due to previously bestowed subsidies. The fact no such discount was involved is evidenced by Commerce's finding "that BSC and GKN paid the *same amount per share* for UES and, as a result, BSC's investment in UES was on terms *consistent with commercial consideration."* *Id.* at 6243 (emphasis added). Indeed, it would have been unusual for the parties to have considered making such a discount given the fact Congress has never indicated its desire to impose CVDs on producers that purchase their facilities at fair market value. With no countervailable benefit surviving the arm's length transaction between BSC and UES, there is no benefit conferred to UES and, therefore, no countervailable subsidy within the meaning of 19 U.S.C. § 1677(5). *See id.* To impose a CVD in this situation would violate the legislative intent of the CVD laws which requires Commerce to "relat[e] the benefit of the commercial advantage to the recipient." H.R.REP. No. 317, 96th Cong., 1st Sess. 75 (1979).

█ The Court does not find any merit in Commerce's concern that recipients of subsidies could circumvent CVD law by selling off productive units. According to Commerce, should it

> determine that the original recipient of subsidies continues receiving the entire benefit of those subsidies, [it] would not only leave companies like BSC "holding the bag," [it] would also invite subsidy recipients to sell of units that produce or export countervailed merchandise to the United States. In the end, a "bubble" of subsidies would remain with a virtually empty corporate shell which would not be affected by any countervailing duties because it did not produce or export the countervailed merchandise to the United States.

*Final Determination,* 58 Fed.Reg. at 6240. As the Court stated in *Saarstahl,* if a subsidized corporation completely sells off, in an arm's length transaction, that portion of its business which exports to the U.S., "the amount of its past and present subsidies are of no consequence to Commerce. The subsidies are only relevant if that corporation continues to export or at some future date resumes exporting to the U.S." *Id.,* 18 CIT at —— – ——, 858 F.Supp. at 194. "The purpose of the CVD laws is not to capture somehow a subsidy once it is bestowed. The purpose is to assess countervailing duties against those goods entering the U.S. on an uneven playing field." *Saarstahl,* 18 CIT at ——, 858 F.Supp. at 194 (citing *British Steel Corp. v. United States,* 9 CIT 85, 95, 605 F.Supp. 286, 294 (1985)). If the successor business is not a recipient of a subsidy, and has paid fair market value for the productive unit, then there is no unfair competitive advantage which must be offset by CVDs. Once a productive unit has been sold in an arm's length transaction at fair market value, Commerce must look to the subsidy recipient, in this case BSC, and reallocate the subsidy over the remaining business. Such an approach is no different from what Commerce would have done had BSC closed, rather than sold, the Special Steels Business.

Commerce has failed to "relate the benefit of the commercial advantage to the recipient" in determining subsidies bestowed upon BSC travelled with the Special Steels Business to UES. *See Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966. "Commerce has developed its privatization methodology in the absence of any direction by Congress and in direct contravention of the guiding purpose of the CVD laws." *Saarstahl,* 18 CIT at ——, 858 U.S. at 194 (footnote omitted). Commerce has attempted to engraft upon ordinary arm's length, market rate transactions, the onerous requirement that buyers value the potential liability of purchasing productive units which previously received countervailable subsidies. This Court is not willing to impede so seriously commercial activity. The Court, therefore, holds Commerce has erred as a matter of law and the *Final Determination* as modified by the *Remand Determination* is vacated to the extent Commerce determined previously bestowed subsidies are passed through to a successor company in an arm's length transaction.

## CONCLUSION

█ Having considered all of the parties' arguments in this consolidated action, the Court holds Commerce's determination that the transfer of the Special Steels Business to UES was an arm's length transaction between unrelated parties based on market value is supported by substantial evidence and is otherwise in accordance with law. Additionally, the Court holds Commerce's privatization methodology, to the extent it states previously bestowed subsidies are passed through to a successor company sold in an arm's length transaction, is unlawful. Because the Court holds Commerce unlawfully concluded BSC's subsidies travelled to UES, the Court need not address the parties other arguments. Inland Steel's motion is denied in all respects. Judgment is for United Engineering Steels, Ltd.

## ORDER

This case having been duly submitted for decision and this Court, after due delibera-

tion, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED** Commerce's determination that the transfer of the Special Steels Business to UES was an arm's length transaction between unrelated parties based on market value is affirmed; and it is further

**ORDERED** that *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom,* 58 Fed.Reg. 6237 (Dep't Comm.1993) (final determination), as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom* (1993) is vacated, to the extent Commerce determined previously bestowed subsidies are passed through to a successor company sold in an arm's length transaction; and it is further

**ORDERED** that Inland Steel's motion is denied in all respects; and it is further

**ORDERED** that judgment is for United Engineering Steels Ltd.

## SCHEDULE OF CONSOLIDATED CASES

*United Engineering Steels Ltd. v. United States,* Court No. 93–04–00235.