**SAARSTAHL AG, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Inland Steel Bar Co., Defendant–Intervenor.**

**Slip Op. 97–67.**
**Court No. 93–04–00219.**

United States Court of International Trade.

May 29, 1997.

LeBoeuf, Lamb, Leiby & MacRae (Mary Patricia Michel: on Saarstahl's Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record and Response of Saarstahl AG to the Motion for Judgment on the Agency Record of Inland Steel Bar Company), Washington, DC, Grunfeld, Desiderio, Lebowitz & Silverman (Max F. Schutzman, David L. Simon, Jeffrey S. Grimson: on Reply Brief of Saarstahl AG), New York City, deKieffer & Horgan (J. Kevin Horgan, Marc Montalbine: on Saarstahl's Comments on Remand Determination), Washington, DC, counsel, for plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Jeffrey M. Telep); Marguerite Trossevin, Attorney–Advisor, Washington, DC, Office of Chief Counsel for Import Administration, United States Department of Commerce, counsel, for defendant.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, Willis S. Martin III, Brian E. Rosen), Washington, DC, counsel, for defendant-intervenor.

## OPINION

CARMAN, Chief Judge.

Before the Court are motions for Judgment on the Agency Record made by plaintiff Saarstahl AG ("Saarstahl") and defendant-intervenor Inland Steel Bar Company ("Inland") pursuant to U.S. CIT R. 56.2. Plaintiff argues the Department of Commerce's ("Department" or "Commerce") decision in *Final Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 6,233 (Dep't Comm.1993) (*"Final Affirmative Determination"* or *"Certain Hot Rolled Lead")* as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Steel Products From*

*Germany* (dated Oct. 12, 1993) (*"Remand Determination "*) is unsupported by substantial evidence on the record and is not otherwise in accordance with law.

Saarstahl also previously moved for oral argument on the non-privatization issues remaining undecided after the issuance of this Court's opinion in *Saarstahl AG v. United States,* 939 F.Supp. 898 (CIT 1996) (*"Saarstahl II ")*.[1] Saarstahl claimed oral argument is "vitally important because of the significant amount of time which has transpired since the issues in the case were last briefed" and because of the issuance of decisions relevant to this proceeding by this Court and the United States Court of Appeals for the Federal Circuit ("CAFC") during that time. (Pl.'s Mot. for Oral Arg. or Alt. for Supp. Brief. at 1.) In *Saarstahl AG v. United States,* 949 F.Supp. 863 (CIT 1996) (*"Saarstahl III ")*, this Court reserved decision on plaintiff's Motion for Oral Argument as to issues remaining undecided after this Court's decision in *Saarstahl II.* In this opinion, therefore, this Court will review Commerce's *Final Affirmative Determination* as modified by the *Remand Determination* with respect to issues not pertaining to privatization or allocation, because, as explained below, this Court has addressed those issues in previous opinions.[2]

Plaintiff raises three challenges to the *Final Affirmative Determination.* Plaintiff argues: (1) the contingent repayment obligations at issue were not loans, (2) Commerce erred in calculating the value of the contingent repayment obligations, and (3) Commerce's determination that the private banks' debt forgiveness was a countervailable subsidy is not supported by substantial evidence on the record and is otherwise not in accordance with law.

Defendant–Intervenor also moves for Judgment on the Agency Record, arguing Commerce's *Final Affirmative Determina-*

---

**1.** Saarstahl moved alternatively for supplemental briefing on the issues remaining undecided after *Saarstahl II,* but this Court denied Saarstahl's motion in *Saarstahl v. United States,* 949 F.Supp. 863 (CIT 1996) (*"Saarstahl III "*). In that opinion, the Court indicated it would accept a timely application should the parties wish to renew

their application for supplemental briefing. *Id.* at 870. The parties have not done so.

**2.** *See infra, Section C* and *D* for an overview of this Court's decisions addressing the issue of privatization and allocation.

*tion* and *Remand Determination* are not supported by substantial evidence on the record. Defendant–Intervenor argues Commerce erred when it allocated subsidies received by Saarstahl over the total sales of DHS. Defendant–Intervenor also seeks a remand for a redetermination (1) finding Saarstahl uncreditworthy in 1989, in accordance with *Certain Hot Rolled Lead and Bismuth Carbon Products From Brazil, France, Germany and the United Kingdom,* 57 Fed.Reg. 42,471 (Dep't Comm.1992) (prelim.determ.) (*"Preliminary Determination"*), and adding an uncreditworthiness premium to the discount rate used to calculate the countervailing duty margin.

Defendant argues Commerce's *Final Affirmative* and *Remand Determinations* are supported by substantial evidence on the record and are otherwise in accordance with law, and requests this Court sustain Commerce's determinations except with respect to calculation of the discount rate. Defendant requests this Court remand this issue to Commerce with instructions to reconsider the discount rate in light of Saarstahl SVK's creditworthiness.

The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

### A. *Factual Background*

From the mid–1970s through the mid–1980s, the European steel industries, in general, and the Saarland steel industries in particular, suffered tremendously as a result of the steel crisis caused by the decline in demand and reduced prices for steel. Between 1978 and 1985, Saarstahl Volklingen GmbH ("Saarstahl SVK"), a German steel company,[3] received various subsidies and assistance from the German federal government ("GOG") and the Saarland state government ("GOS") stemming from a Restructuring Plan adopted by the federal and state governments in 1978 to restore competitiveness to Saarstahl SVK and to create a viable steel industry in the Saarland.

The subsidies took the form of guaranteed loans, government funds, and the assumption of principal and interest payments. The federal and state governments also guaranteed loans made to Saarstahl by private banks which would not have made such loans without the government guarantees. Assistance provided to Saarstahl was used to modernize the company, make capital investments and cover operating and employee expenses pursuant to a number of Saarstahl restructuring plans. All of the assistance contained a repayment obligation known as "Rückzahlungsverpflich" or "RZV," which obligated Saarstahl SVK to repay the governments if the company returned to profitability. By 1989, Saarstahl SVK had accumulated DM 3.948 billion in repayment obligations to both governments.

Until 1986, Saarstahl SVK was wholly owned by Arbed Luxembourg ("Arbed"), a Luxembourg state-owned company. By 1985, Arbed was no longer able or willing to function as the owner of Saarstahl. Because of the importance of Saarstahl to the local economy, the GOS decided to search for a new owner to replace Arbed. In 1986, in order to facilitate finding a new investor for Saarstahl, Arbed transferred 76 percent of its ownership of Saarstahl SVK to the GOS for DM 1. Usinor–Sacilor, a French company which owned German steel producer AG der Dillinger Huttenwerke ("Dillinger"), also expressed interest in purchasing Saarstahl SVK, but only on the condition Saarstahl was relieved of its debt burden. At the time, Dillinger and Saarstahl SVK were already partners in a joint venture company which produced pig iron.

On April 20, 1989, the GOS reached an agreement with Usinor–Sacilor to merge Saarstahl SVK with Dillinger. On June 15, 1989, Saarstahl SVK's name was changed to DHS–Dillinger Hütte Saarstahl AG ("DHS") and all assets and liabilities of Saarstahl SVK were transferred to DHS. Saarstahl SVK's legal form also changed from "GmBH," a limited liability corporation, to "AG," a German stock company. In exchange for Saar-

---

**3.** Saarstahl is a producer of long products, such as steel bars and rods in Germany's Saarland region.

stahl SVK's assets and a capital contribution of DM 145.1 million, the GOS received a 27.5 percent ownership interest in Saarstahl AG. Arbed received a 2.5 percent ownership interest in Saarstahl AG in exchange for a capital contribution of DM 8.9 million and its shares of Saarstahl. Usinor–Sacilor's in-kind contribution of all of its shares of Dillinger was valued at DM 417.3 million and resulted in a 70 percent ownership interest in the newly-formed DHS. Usinor–Sacilor conditioned this agreement upon the federal and Saarland state governments' forgiveness of all of Saarstahl SVK's RZVs.

On June 30, 1989, DHS transferred the former Saarstahl SVK's lead-bar assets and liabilities to a newly formed subsidiary, Saarstahl AG ("Saarstahl"). As a result of these events, DHS became a holding company with two operating subsidiaries, Saarstahl AG and Dillinger, and was owned 70 percent by Usinor Sacilor, 27.5 percent by the GOS and 2.5 percent by Arbed.[4] The result of the combination for Saarstahl was that it had been privatized in an arm's-length market transaction which involved a change from ownership and control by the GOS to majority ownership by private interests. *See Remand Determination* at 2.

Pursuant to the merger agreement and as a condition for sale, the GOG and GOS entered into an agreement concerning the previous assistance received by Saarstahl SVK. Under this agreement, all outstanding repayment obligations for the funds provided to Saarstahl SVK, as well as the additional rights held by both governments for the repayment of the principal on the guaranteed loans, were forgiven and relinquished. At the request of the governments, private banks also forgave a portion of the debt owed to them by Saarstahl SVK.

### B. *Countervailing Duty Investigation*

Commerce initiated a countervailing duty investigation of Saarstahl on May 8, 1992, based on a petition filed by Inland Steel Bar Company and Bethlehem Steel Corporation against imports of certain hot-rolled lead and bismuth carbon steel products from Germany. Commerce issued its *Preliminary Determination* on September 17, 1992. On January 27, 1993, in its *Final Affirmative Determination,* Commerce determined "benefits which constitute subsidies within the meaning of the countervailing duty (CVD) law[5] are being provided to manufacturers, producers, or exporters in Germany of certain hot rolled lead and bismuth carbon steel products." *Final Affirmative Determination,* 58 Fed.Reg. at 6,233. The *Final Affirmative Determination* continued on to note "[b]ecause the debt forgiveness ... was only provided to one company," it fell within 19 U.S.C. § 1677(5)(A)(ii) (1988) as "limited to a specific enterprise or industry or group of enterprises or industries" and was, as a result, countervailable. *Id.* at 6,234. Additionally, Commerce determined because the German governments' forgiveness of Saarstahl's debts was necessary to effect the sale or privatization of Saarstahl, the entire amount of debt-forgiveness directly benefitted Saarstahl's new parent, the then newly-formed DHS, and therefore was a countervailable subsidy to DHS. Commerce stated "[b]ecause the debt forgiveness was part of the deal negotiated to effect the merger, we consider the forgiveness to benefit the newly-formed company, not the predecessor to DHS. Therefore, pass through of subsidies received by the predecessor company is not at issue here." *Id.* at 6,236–37.

Commerce also determined the debt forgiveness by private banks was countervailable, because "it was required by the governments as part of a government-led debt reduction package for Saarstahl and be-

---

4. DHS owned 100 percent of Saarstahl AG and 95 percent of Dillinger. Both Saastahl AG and Dillinger had profit and loss agreements with DHS under which they were to transfer any profits to DHS and DHS was required to assume any losses incurred by Dillinger and Saarstahl AG.

5. The statute provides a countervailable domestic subsidy is a benefit "provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise." 19 U.S.C. § 1677(5)(A)(ii) (1988).

cause the two governments guaranteed the future liquidity of Saarstahl, thereby, implicitly assuring the private banks that the remaining portion of Saarstahl's outstanding loans would be repaid." *Id.* at 6,235. Following the ITC's affirmative injury determination, Commerce issued a countervailing duty order for the relevant products under investigation. *See Countervailing Duty Order: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 15,325 (Dep't Comm.1993).

### C. Privatization

In a subsequent countervailing duty investigation entitled *Final Affirmative Countervailing Duty Determination; Certain Steel Products From Germany,* 58 Fed.Reg. 37,-315 (Dep't Comm.1993) (*"German Certain Steel"*), based upon a review of the identical facts presented in the *Final Affirmative Determination* in *Certain Hot Rolled Lead,* Commerce reconsidered the effect of privatization on the benefits conferred on Saarstahl by private sources and modified the position it took in the *Certain Hot Rolled Lead Final Affirmative Determination.* In the new investigations, Commerce determined "the debt forgiveness ... provided benefits to Saarstahl which were then passed through to DHS." *German Certain Steel,* 58 Fed.Reg. at 37,320. Commerce determined the benefit from the forgiveness of Saarstahl's debt was "allocable to DHS because the restructuring would not have occurred but for the government's intervention." *General Issues Appendix to Final Affirmative Countervailing Duty Determination: Certain Steel Products From Austria,* 58 Fed.Reg. 37,225, 37,272 (Dep't Comm.1993) (*"General Issues Appendix"*). Commerce further determined although the privatization of a public company through an arm's length sale did not automatically extinguish the countervailability of the prior subsidies, the price paid for the company could constitute a partial repayment of the prior subsidies and the portion of

the subsidy deemed to be repaid was not countervailable. *See German Certain Steel,* 58 Fed.Reg. at 37, 320. Commerce explained,

> a private party purchasing all or part of a government-owned company (*e.g.* a productive unit) can repay prior subsidies on behalf of the company as part or all of the sales price. Therefore, to the extent that a portion of the price paid for a privatized company can reasonably be attributed to prior subsidies, that portion of those subsidies will be extinguished.

*General Issues Appendix,* 58 Fed.Reg. at 37,262–63.[6]

In light of its determination in *German Certain Steel,* Commerce concluded its prior *Final Affirmative Determination* in *Certain Hot Rolled Lead* was not supported by substantial evidence on the record and was not otherwise in accordance with law. As a result of its decision in *German Certain Steel,* Commerce requested and was granted a remand on September 21, 1993, to reconsider the *Final Affirmative Determination* in *Certain Hot Rolled Lead* because the new privatization methodology developed in *German Certain Steel* markedly differed from the methodology utilized by Commerce in the *Certain Hot Rolled Lead Final Affirmative Determination.* On remand, Commerce explained "[w]e have reconsidered our original determination regarding the effects of privatization on subsidies previously received by Saarstahl and have concluded that it is not supported by substantial evidence and otherwise in accordance with law." *Remand Determination* at 2. Commerce re-analyzed the privatization of Saarstahl and applied the methodology articulated in the privatization section of the *General Issues Appendix.* Commerce determined the forgiveness of Saarstahl SVK's debt amounted to a grant, the benefit of which passed to Saarstahl AG after privatization. Commerce also determined part of the Saarstahl sales price contributed to repaying the prior subsidies to

---

**6.** Commerce's new approach is explained in the sections entitled "Privatization" and "Restructuring" contained in the *General Issues Appendix.* The *General Issues Appendix* addresses issues that were common to several countervailing duty investigations of steel products from various countries. The section of the Appendix addressing the privatization methodology is found at 58 Fed.Reg. at 37,259–65. The section of the Appendix addressing restructuring is found at 58 Fed.Reg. at 37,265–73.

the same extent that the subsidies comprised Saarstahl SVK's net worth and adjusted the countervailing duty margins accordingly. This finding lowered the countervailing duty from 17.28 percent to 16.85 percent.

As a result of the actions filed appealing Commerce's *Final Affirmative Determination* as modified by Commerce's *Remand Determination,* in *Saarstahl AG v. United States,* 858 F.Supp. 187 (CIT 1994), the Court of International Trade ("CIT") upheld Commerce's finding Saarstahl was privatized as based on substantial evidence and as otherwise in accordance with law. This Court also held, however, Commerce's privatization methodology, to the extent it stated previously bestowed subsidies are passed through to a successor company sold in an arm's-length transaction, was unlawful.

In *Saarstahl AG v. United States,* 78 F.3d 1539 (Fed.Cir.1996), the CAFC reversed and remanded this Court's decision in *Saarstahl, AG v. United States,* 858 F.Supp. 187 (CIT 1994). *See also Inland Steel Bar Co. v. United States,* 86 F.3d 1174 (Fed.Cir.1996), *rev'g and remanding,* 858 F.Supp. 179 (CIT 1994). The Federal Circuit held this Court "erred in holding that *as a matter of law* a subsidy cannot be passed through during an arm's length transaction." *Saarstahl,* 78 F.3d at 1544 (emphasis in original). The Federal Circuit remanded the case to this Court, concluding this Court did not address all of the parties' arguments, including Commerce's request for a remand to review the agency's allocation of Saarstahl's purchase price to repayment of prior subsidies and to assess Saarstahl's creditworthiness in 1989. As a result, this Court subsequently remanded the action to Commerce in *Saarstahl AG v. United States,* 933 F.Supp. 1106 (CIT 1996) (*"Saarstahl I "*).

Following the CAFC's decision in *Saarstahl AG v. United States,* 78 F.3d 1539 (Fed.Cir.1996), this Court ruled on the Department's privatization remand in *British Steel plc v. United States,* 924 F.Supp. 139 (CIT 1996) (*"British Steel II "*), appeals docketed, Nos. 96–1401 to –06 (Fed. Cir. June 21, 1996). While affirming the Department's determinations regarding several countries, this Court stayed its consideration of the privatization remand as it pertained *German Certain Steel.* In an order dated April 30, 1996, this Court vacated that stay, instructing the Department to address and make findings regarding seven additional issues in light of the Court's decisions in *British Steel plc. v. United States,* 879 F.Supp. 1254 (CIT 1995) (*"British Steel I "*), appeals docketed, Nos. 96–1401 to –06 (Fed. Cir. June 21, 1996) and *British Steel II.* Commerce did so in *Final Results of Redetermination Pursuant to Court Remand On Certain Factual Issues Regarding the Privatization in Germany Saarstahl AG v. United States* (August 19, 1996) (*"Final Results"*).

In *Final Results,* Commerce referred to this Court's order of April 30, 1996 instructing Commerce to address and make findings regarding seven issues concerning the privatization at issue in light of the Court's decisions in the *British Steel* cases. Commerce followed the Court's order and made findings in response to the seven issues. Commerce determined "the Department may properly countervail the exports of Saarstahl AG ... in the full amount of the subsidies received prior to privatization which are attributable to Saarstahl." *Final Results* at 4 (footnote omitted).

In addressing the question of whether the pre-privatization entity had received subsidies which survived privatization, Commerce held while the identity of the shareholders with ownership interests differed after privatization, the corporate identity of Saarstahl remained unaltered. Commerce stated it was, therefore, the same entity that had formerly received subsidies. *See Final Results* at 10–11. The Department determined

> DHS/Dillinger [post privatization DHS] does not cease to be for all intents and purposes the same entity which received the subsidies simply because most of SVK/Dillinger's [pre-privatization DHS] assets were transferred to the newly-created subsidiary [Saarstahl AG] two weeks after privatization. The privatized DHS/Dillinger continued to benefit from those assets and to be responsible for the remaining liabilities after the transfer to [Saarstahl AG] just as it had after the

combination with Dillinger but prior to the creation of [Saarstahl AG].

*Final Results* at 11. Thus, Commerce concluded, DHS/ Dillinger—the post-privatization entity—remained for all intents and purposes the same entity as SVK/Dillinger—the pre-privatization entity which received the subsidy. *Id.* at 12.

On September 3, 1996, this Court found those aspects of the *Final Results* pertaining to the issue of privatization were supported by substantial evidence on the record and otherwise in accordance with law and entered final judgment with respect to the issue of privatization pursuant to U.S. CIT R. 54(b). *See Saarstahl AG v. United States,* 939 F.Supp. 898 (CIT 1996) (*"Saarstahl II "*), *appeal docketed,* No. 97–1122 (Fed.Cir. Nov. 25, 1996), *consolidated with* No. 97–1135 (Fed.Cir. Dec. 5, 1996). In *Saarstahl II,* the Court also denied Saarstahl's Motion for Oral Argument with respect to privatization, but indicated the non-privatization issues would be decided in a future, separate opinion and oral argument might be appropriate to assist the Court in resolving those non-privatization issues. *See Saarstahl II,* 939 F.Supp. at 901 n. 3. It is these non-privatization issues which the Court addresses in this opinion.

### D. *Allocation*

In *Saarstahl AG v. United States,* 949 F.Supp. 863 (CIT 1996) (*"Saarstahl III"*), Saarstahl moved for leave to amend its Complaint to include a Count VII challenging Commerce's use of the fifteen-year average useful life found in the Internal Revenue Service ("IRS") tax tables to allocate the benefit of nonrecurring subsidies as unsupported by substantial evidence on the record and as not otherwise in accordance with law. Saarstahl argued use of the new allocation methodology was required by this Court's recent decisions in *British Steel plc. v. United States,* 929 F.Supp. 426 (CIT 1996) (*"British Steel III"*) and *British Steel I,* where the Court struck down Commerce's use of the fifteen-year average useful life from the IRS tax tables to allocate the benefit of nonrecurring subsidies and affirmed a methodology which allocated nonrecurring subsidies based upon actual average useful life of the physical assets for each respondent. Saarstahl also requested oral argument on the issue of allocation. In *Saarstahl III,* this Court denied Saarstahl's Motion for Leave to Amend its Complaint and for Oral Argument on the issue of allocation. This Court held allowing Saarstahl to raise the allocation issue would unfairly prejudice both defendant-intervenor Inland Steel Bar Company as well as the Commerce Department. As a result, this issue regarding Commerce's use of the fifteen-year average useful life from the IRS tax tables to allocate the benefit of nonrecurring subsidies is not before the Court in this decision.

## CONTENTIONS OF THE PARTIES

### A. *Saarstahl AG v. United States & Inland Steel Bar Company*

Plaintiff raises three challenges to Commerce's *Final Affirmative* and *Remand Determinations.* First, Saarstahl asserts Commerce "erroneously found that the abandonment of contingent repayment obligations at the time Saarstahl was privatized constituted a new countervailable event in 1989, in the form of the forgiveness of long-term, interest-free, contingent-liability loans." (Pl.'s Mem. in Supp. of Mot. for J. on the Agency R. ("Pl.'s Mem.") at 11.) Second, Saarstahl argues Commerce's determination that the value of the abandoned RZVs in 1989 was their "face value," that is, the value of the assistance given in the late 1970s and 1980s, is contrary to record evidence. Third, Saarstahl argues the ITA's determination that the private banks' debt forgiveness provided a countervailable subsidy is unsupported by substantial evidence on the record and is otherwise not in accordance with law.

Defendant argues Commerce properly determined the German governments' forgiveness of Saarstahl's contingent repayment obligations constituted a countervailable subsidy in 1989. Defendant additionally argues Commerce's determination the governments' forgiveness of the RZVs constituted a countervailable benefit in an amount equal to the face value of the RZVs is reasonable and is supported by substantial evidence on the

record. Defendant also argues the forgiveness of Saarstahl's debt held by private banks constitutes a countervailable subsidy.

Inland argues Saarstahl did not successfully demonstrate the RZVs were not repayment obligations which were forgiven, and therefore, Commerce's determination should be sustained. Inland additionally asserts Commerce's valuation of the RZVs was reasonable and supported by record evidence. Finally, Inland contends Commerce's findings with regard to the private banks' forgiveness of Saarstahl's debt should not be disturbed.

### B. *Inland Steel Bar Company v. United States*

Defendant–Intervenor Inland Steel Bar Company also moves for Judgment on the Agency Record, arguing the *Final Affirmative* and *Remand Determinations* of Commerce are unlawful, void and of no effect. Inland argues Saarstahl has "ignored basic principles of administrative law and procedure in an attempt to reargue its case *de novo*." (Opp'n to Pl.'s Mot. for J. on Agency R. ("Def.-Int.'s Opp'n") at 2.) Defendant–Intervenor further argues the Department's errors "resulted in a determination that is arbitrary, capricious and an abuse of discretion." (Def.-Int.'s Mot. for J. on Agency R. at 2.)

First, Inland argues Commerce erred when it "treated subsidies received only by Saarstahl as benefitting products produced by DHS's other subsidiary, Dillinger." (Br. in Supp. of Def.-Int.'s Mot. for J. on Agency R. ("Def.-Int.'s Br.") at 2.) Inland argues Commerce should allocate subsidies granted to Saarstahl only over the products made by Saarstahl, excluding merchandise produced by Dillinger.

Second, Inland maintains Commerce erred when, "[w]ithout explanation, the Final Determination apparently found Saarstahl as creditworthy in 1989, in spite of finding the company *un* creditworthy in the Preliminary Determination." (*Id.*) Inland concludes, "[b]ecause of [these] errors[ ], this Court should remand the determination to Commerce to correct [these errors]." (*Id.*) Defendant requests a remand so Commerce can

reconsider the discount rate in light of the findings in Commerce's *Remand Determination*. Saarstahl, however, objects to a remand for Commerce to include a risk premium in the discount rate.

### STANDARD OF REVIEW

■ The appropriate standard for the Court's review of a final determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is that which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citation omitted), *quoted in Matsushita Elec. Indus. Co., Ltd. v. United States*, 3 Fed Cir. (T) 44, 51, 750 F.2d 927, 933 (1984).

■ The Court must accord substantial weight to the agency's interpretation of the statute it administers. *See American Lamb Co. v. United States*, 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). While Commerce has discretion in choosing one interpretation over another, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), *cited in Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) ("[T]his Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."), *aff'd*, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). The Court is not to substitute its own determination for the agency's but rather is to determine whether Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. *See, e.g., Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (noting "the possibility of drawing two inconsistent conclu-

sions from the evidence does not permit an administrative agency's finding from being supported by substantial evidence"); *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467–68 (1951) (the reviewing court may not "even as to matters not requiring expertise ... displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ").

## DISCUSSION

In accordance with a February 18, 1994 scheduling order, and after extensive consultation with the parties and upon their consent, the parties were directed to brief five general issues regarding determinations by the International Trade Administration ("ITA") addressing steel products from various countries.[7] The order also set forth a schedule for the parties to submit individual briefs on a country-specific basis addressing other issues raised by the ITA's determinations. In prior opinions, this Court has disposed of all challenges to the five general issues and they are presently on appeal before the Court of Appeals for the Federal Circuit. *See British Steel plc v. United States*, 936 F.Supp. 1053 (CIT 1996) (*"British Steel IV"* ); *British Steel III*, 929 F.Supp. 426; *British Steel II*, 924 F.Supp. 139; *British Steel I*, 879 F.Supp. 1254 (collectively the *"British Steel* cases" or the "general issues opinions"). What remains before this Court are the parties' country-specific challenges to Commerce's steel determinations. As a result, this opinion will not address the chal-

lenges raised in the parties' papers regarding the propriety of Commerce's privatization methodology nor its choice of the fifteen-year allocation period to determine the benefit from each of the nonrecurring countervailable subsidies because those issues have been decided conclusively in the general issues opinions. This opinion will address only country-specific issues involving Saarstahl which remain undecided following the general issues decisions. While the Court believes this opinion is in no way inconsistent with its prior opinions addressing the general issues, to the extent this opinion is seen to conflict in any way with the Court's general issues decisions, this Court's findings in the general issues opinions will prevail.

### A. *Saarstahl AG v. United States & Inland Steel Bar Company*

This Court notes the three arguments raised by plaintiff as challenges to the *Final Affirmative* and *Remand Determinations.* Plaintiff argues: (1) the contingent repayment obligations at issue were not loans, (2) Commerce erred in calculating the value of the contingent repayment obligations, and (3) Commerce's determination that the private banks' debt forgiveness was a countervailable subsidy is not supported by substantial evidence on the record and is otherwise not in accordance with law. While the issues raised by plaintiff's challenges would be properly before the Court in this opinion because they do not relate to general issues of privatization or allocation, the Court notes these three issues have been addressed conclusively in *British Steel IV.*[8] In *British Steel IV,* this

---

**7.** The five general issues were: (1) Commerce's use of a 15-year allocation period to determine the benefit from each of the nonrecurring countervailable grants; (2) Commerce's use of a grant methodology to countervail equity infusions into an uncreditworthy company whose shares are not publically traded; (3) Commerce's treatment of privatization and restructuring regarding previously received subsidies, including Commerce's use of a repayment methodology; (4) Commerce's determination of the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries; and (5) Commerce's treatment of disproportionality for the purposes

of evaluating the specificity of a potentially countervailable program.

**8.** In *British Steel IV,* Dillinger set forth six arguments, three of which were identical to plaintiff's challenges in this opinion and one of which was identical to an argument presented by Inland in this opinion. Dillinger argued: (1) Commerce improperly allocated the subsidies at issue over total DHS sales, including Dillinger's sales of flat-rolled steel plate products; (2) Commerce's finding the abandonment of contingent repayment obligations (RZVs) constituted forgiveness of long-term, contingent-liability, interest-free loans was not supported by evidence on the record; (3) assuming the 1989 abandonment of the RZVs was a countervailable event, Com-

Court indicated its opinion would "result in the final resolution of all issues presented." *British Steel IV*, 936 F.Supp. at 1057. As a result, the Court supports the determinations made regarding these country-specific issues in *British Steel IV* and will not reexamine those issues again in this opinion.

### B. *Inland Steel Bar Company v. United States*

■ This Court additionally finds Inland's argument regarding the allocation of subsidies over total sales of DHS [9] was decided conclusively in *British Steel IV* and therefore will not be reexamined in this opinion. *See British Steel IV*, 936 F.Supp. at 1067–68 (noting "Commerce's attribution of the subsidies received by DHS to the production of Dillinger as a subsidiary of DHS is supported by substantial evidence and is otherwise in accordance with law").[10]

Inland's additional argument that Commerce should reconsider the discount rate in light of Saarstahl's creditworthiness is before the Court in this opinion. Commerce treated

the debt forgiveness by the governments and the private banks as grants and calculated the benefit from the forgiveness in accordance with its grant methodology, which requires the selection of a discount rate to allocate the benefits over time. *See Proposed Regulations*, 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(1)(ii)).[11] When the recipient of a grant is found to be uncreditworthy, Commerce adds a "risk premium" to the discount rate to reflect the increased costs such a company faces and the extra risk of lending to an uncreditworthy company. While the *Proposed Regulations* provide for Commerce's· utilization of uncreditworthy benchmark rates and do not specifically provide for uncreditworthy discount rates, Commerce has consistently followed its practice of using uncreditworthy discount rates both before and after issuance of the *Proposed Regulations*. *See e.g., Final Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From France*, 58 Fed. Reg. 6,221, 6,224 (Dep't Comm.1993) (final

merce erred in determining that the value of the abandoned RZVs in 1989 was their "face" value; and (4) Commerce erred in finding forgiveness of principal and interest by private banks constituted a countervailable subsidy.

The Court rejected Dillinger's arguments and sustained Commerce, holding Commerce's allocation of the subsidies at issue over total DHS sales, including Dillinger's sales of flat-rolled steel plate products was supported by substantial evidence on the record and was otherwise in accordance with law. The Court also rejected Dillinger's arguments regarding the countervailability of the abandoned RZVs, as well as Dillinger's arguments about Commerce's determination of the RZVs' value. Finally, the Court sustained Commerce's finding the private banks' debt forgiveness was a countervailable subsidy as supported by substantial evidence on the record and as otherwise in accordance with law.

9. The Court notes the specific issue of the allocation of subsidies over the total sales of DHS is distinct from the general issue of Commerce's use of a 15–year allocation period to determine the benefit from each of the nonrecurring countervailable grants.

10. In Saarstahl's original brief, Saarstahl also argued Commerce incorrectly determined to allocate subsidy benefits found to Saarstahl over the total sales of both DHS subsidiaries, Saarstahl and Dillinger, when it should have "tied" those benefits entirely to Saarstahl's long products production. (*See* Pl.'s Mem. at 13–26).

Saarstahl withdrew this argument in its Reply Brief. *See* Saarstahl AG's Reply Br. at 2 (stating "Saarstahl hereby withdraws its argument that ITA's allocation of subsidies over the sales of both Saarstahl and its related companies was unlawful.")

11. The proposed regulation provides

§ 355.49 **Allocation of countervailable benefits over time.**

. . . .

(b)(1) *Process for allocating grants and certain equity infusions over time.* In allocating over time the benefit from a nonrecurring grant or an equity infusion described in § 355.44(e)(1)(i), the Secretary will use the following three-step process:

(i) Determine the amount of the countervailable benefit pursuant to § 355.44;

(ii) Assign a discount rate; and

(iii) Construct a benefit stream.

(2) For purposes of paragraph (b)(1)(ii) of this section, the Secretary will use as a discount rate the following, in order of preference:

(i) The cost of long-term, fixed-rate debt of the firm in question, excluding loans found to confer a countervailable subsidy;

(ii) The average cost of long-term, fixed-rate debt in the country in question; or

(iii) A rate which the Secretary considers to be most appropriate.

*Proposed Regulations*, 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49).

determ.) (benchmark interest rate used as discount rate); *Final Affirmative Counter-vailing Duty Determinations: Certain Steel Products From Spain,* 58 Fed.Reg. 37,374, 37,384–85 (Dep't Comm.1993) (final determ.) (same); *Final Affirmative Countervailing Duty Determination: New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. 31,991, 31,994 (Dep't Comm.1989) (final determ.) (same); *Certain Carbon Steel Products From Brazil; Final Results of Counter-vailing Duty Administrative Review,* 52 Fed.Reg. 829, 831 (Dep't Comm.1987) (final results of admin. review) (same).

Inland argues Commerce erred when it omitted an uncreditworthiness risk premium from its calculation of the discount rate after finding Saarstahl uncreditworthy in the *Preliminary Determination* [12] and reaching no conclusion about the company's creditworthiness in the *Final Affirmative Determination.* Inland argues Commerce's failure to add a risk premium to the discount rate implies Saarstahl was creditworthy in 1989, "a finding completely without support on the administrative record." (Def.-Int.'s Br. at 21–22.)

Inland argues Commerce's failure to add an uncreditworthiness risk premium to the discount rate "is reversible error because Commerce implicitly reversed the Preliminary Determination's uncreditworthiness premium without explanation. This action violates the principle that Commerce must set forth 'grounds for [any] departure from prior norms ... so that the reviewing court may understand the basis of the agency's action." (*Id.* at 12–13 (citation omitted).) Inland explains "[a] finding of uncreditworthiness can substantially increase the countervailing duty rate," (*id.* at 21), and concludes "Commerce had to

add an uncreditworthiness premium to the discount rate because there is not *any* evidence on the administrative record to support a finding that Saarstahl was creditworthy." (*Id.* at 13.) As a result, Inland argues this Court should remand this issue to Commerce with instructions to find Saarstahl uncreditworthy in 1989 and to add an uncreditworthiness risk premium to the discount rate.

Defendant explains Commerce made a preliminary determination Saarstahl SVK was uncreditworthy in 1989, but did not finalize that determination and include a risk premium because DHS was deemed to be the direct beneficiary of the debt forgiveness in the *Final Affirmative Determination.* Defendant continues to note when the *Final Affirmative Determination* was modified on remand, however, Commerce concluded the debt forgiveness was a benefit to Saarstahl SVK that passed through to DHS. *See Remand Determination* at 6, 9. Defendant maintains since Commerce measures a subsidy at the time of receipt, "[i]f Saarstahl SVK, the initial recipient of the benefit from the debt forgiveness, was uncreditworthy in 1989, a risk premium should be included." (Def.'s Mem. at 58.) As a result, defendant requests this Court remand the determination so Commerce may reconsider the discount rate in light of the findings in Commerce's *Remand Determination.*

Saarstahl objects to a remand in order to include a risk premium. In addressing Commerce's change in characterizing the beneficiary of the debt forgiveness, Saarstahl argues Commerce "asserts a distinction without a difference" and "simply makes a false distinction between 'direct' benefits to DHS and benefits which 'subsequently passed through' to DHS. There was no time

---

**12.** The *Preliminary Determination* included a finding Saarstahl was uncreditworthy when the government forgave its debt in 1989. In the *Preliminary Determination,* Commerce based its discount rate on the highest long-term interest rate applicable to firms in Germany and added to that figure an amount equal to 12 percent of the country's prime rate. *Preliminary Determination,* 57 Fed.Reg. at 42,972. *See Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv) ("[I]f the Secretary deems a firm to be uncreditworthy ..., the Secretary will calculate the benchmark interest rate for a long-term government loan by taking the

sum of 12 percent of the prime rate in the country in question and: [other relevant actors]....")). Commerce noted that according to the response of the GOG, there were no official statistics on long-term interest rates or interest rates comparable to the U.S. prime rate in Germany and "[t]herefore, [Commerce] reviewed the interest rates published in the International Monetary Fund's International Financial Statistic and used the average annual interest rate reported in that publication for 1989, the year in which Saarstahl's debt was forgiven." *Preliminary Determination* at 42,372. Commerce calculated a discount rate of 11.13 percent.

lag which would justify imposing a risk premium in this case." (Pl.'s Reply Br. at 23–24 (citation omitted).) Saarstahl additionally argues if the creditworthiness of the recipient is the test for whether a risk premium should be imposed, Commerce should examine the creditworthiness of DHS, "which was created under, and benefitted by, the same transaction in which the debt was forgiven." (*Id.* at 24.) If Commerce looked to DHS, Saarstahl maintains, there would be no basis for a risk premium because DHS was not determined to be uncreditworthy. As a result, Saarstahl argues, whether Saarstahl SVK was creditworthy at the time of the 1989 transaction is immaterial and the Court should deny Commerce's request for a remand on this issue.

This Court finds defendant's arguments advocating a remand on this issue are reasonable and grants defendant's request to remand this issue. Commerce will reconsider the issue of Saarstahl's creditworthiness and make a finding as to whether a risk premium should be included in the calculation of the discount rate. Commerce shall reconsider the discount rate in light of Saarstahl's creditworthiness and recalculate the countervailing duties due, if any, as a result of the discount rate determination.

### CONCLUSION

After carefully considering the arguments of all parties, this Court denies plaintiff's Motion for Judgment on the Agency Record, as well as plaintiff's Motion for Oral Argument. This Court denies in part and grants in part defendant-intervenor's Motion for Judgment on the Agency Record. This Court sustains Commerce's *Final Affirmative Determination* as modified by the *Remand Determination* with respect to issues not relating to privatization or allocation except with respect to the calculation of the discount rate in light of Saarstahl's creditworthiness. This Court remands this issue to Commerce for it to reconsider the discount rate in light of Saarstahl's creditworthiness.

### JUDGMENT ORDER

This case having been duly submitted for decision and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that plaintiff's Motion for Oral Argument is denied; and it is further

**ORDERED** that plaintiffs' Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED** that defendant-intervenor's Motion for Judgment on the Agency Record is denied in part and granted in part; and it is further

**ORDERED** that Commerce's *Final Affirmative Determination* as modified by Commerce's *Remand Determination* with respect to issues not relating to privatization is sustained except with respect to (1) the calculation of an uncreditworthy discount rate for Saarstahl, and it is further

**ORDERED** that this action is remanded to Commerce with instructions to (1) reconsider the discount rate in light of Saarstahl's creditworthiness and (2) recalculate the countervailing duties, if any, due as a result of the discount rate determination, and it is further

**ORDERED** that (1) Commerce shall file its remand determination with this Court no later than June 16, 1997. Any comments by the parties are due on June 25, 1997 and shall be limited to 10 pages.