**SAARSTAHL AG, Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant/Cross–Appellant,**

**and**

**Inland Steel Bar Co., Defendant–Appellee.**

**Nos. 97–1122, 97–1135 and 98–1122.**

United States Court of Appeals, Federal Circuit.

April 12, 1999.

Marc E. Montalbine, deKieffer & Horgan, of Washington, DC, argued for plaintiff-appellant. With him on the brief was J. Kevin Horgan. Of counsel was Kara K. Pate.

Katherine Barski, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant/cross-appellant. On the brief were David M. Cohen, Director, A. David Lafer, Senior Trial Attorney, and Thomas A. Coulter, Trial Attorney. Of counsel on the brief were Stephen J. Powell, Chief Counsel; John D. McInerney and Elizabeth C. Seastrum, Senior Counsel; and Dean A. Pinkert and Myles S. Getlan, Attorney–Advisors, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

Charles Owen Verrill, Jr., Wiley, Rein & Fielding, of Washington, DC, argued for defendant-appellee. With him on the brief was Willis S. Martyn III. Of counsel were Alan H. Price, Timothy C. Brightbill, Peter S. Jordan, and John A. Hodges.

Before MAYER, Chief Judge, SKELTON, Senior Circuit Judge, and PLAGER, Circuit Judge.

Opinion for the court filed by Chief Judge MAYER. Circuit Judge PLAGER concurs in the result.

MAYER, Chief Judge.

Saarstahl AG ("Saarstahl") and the United States appeal the judgment of the Court of International Trade, Court No. 93–04–00219, *Saarstahl AG v. United States*, 984 F.Supp. 616 (Ct. Int'l Trade 1997) (*"Saarstahl VII"*), affirming the final determination of the United States Department of Commerce ("Commerce") in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from Germany*, 58 Fed.Reg. 6233 (Dep't Comm. Jan. 27, 1993) (final affirm. determ.) (*"Final Lead Bar"*), as modified on remand in *Final Results of Redetermination Pursuant to Court Remand Regarding the Privatization in Germany* (Jun. 30, 1997) (*"Remand Determination III"*), *Final Results of Redetermination Pursuant to Court Remand on Certain Factual Issues Regarding the Privatization in Germany* (Aug. 19, 1996) (*"Remand Determination II"*), and *Remand Determination, Certain Hot Rolled Lead and Bismuth Carbon Steel Products from Germany* (Oct. 12, 1993) (*"Remand Determination I"*). They also appeal interim decisions, *Saarstahl AG v. United States*, 967 F.Supp. 1311 (Ct. Int'l Trade 1997) (*"Saarstahl VI"*), *Saarstahl AG v. United States*, 949 F.Supp. 863 (Ct. Int'l Trade 1996) (*"Saarstahl V"*), *Saarstahl AG v. United States*, 939 F.Supp. 898 (Ct. Int'l Trade 1996) (*"Saarstahl IV"*), and *Saarstahl AG v. United States*, 933 F.Supp. 1106 (Ct. Int'l Trade 1996) (*"Saarstahl III"*). We affirm in part, reverse in part, and remand.

## Background

Between 1978 and 1985, Saarstahl Volklingen GmbH ("SVK") received subsidies from the governments of Germany ("Germany") and Saarland ("Saarland"), all of which contained a repayment obligation, known as RZV, which arose if SVK turned a profit. During this period, Arbed Luxembourg owned SVK, but, in 1985, considered closing operations. As a result of SVK's importance to the region, Saarland and Germany sought another owner and, in 1986, became majority owners to facili-

tate this end. *See Saarstahl VI,* 967 F.Supp. at 1313; *Final Lead Bar,* 58 Fed. Reg. at 6234. Usinor–Sacilor, which owned AG der Dillinger Huttenwerke ("Dillinger"), expressed interest in acquiring SVK, but only if its debt burden were alleviated. In 1989, Saarland brokered a deal to privatize SVK in which it and Germany forgave the RZVs and several private banks forgave portions of their loans. The private banks conditioned their forgiveness on the governments' abandonment of the RZVs and Saarland's promise to assure the future liquidity of the new entity. *See Saarstahl VI,* 967 F.Supp. at 1313; *Final Lead Bar,* 58 Fed.Reg. at 6234–35. SVK became Dillinger Hutte Saarstahl AG ("DHS"), which could issue stock, and Usinor–Sacilor transferred Dillinger to DHS in return for an ownership interest. DHS then transferred the lead bar assets, except for SVK's tax loss carryforward, to a newly formed subsidiary, Saarstahl AG ("Saarstahl"). Dillinger became a second subsidiary of DHS and retained its steel plate assets. *See Saarstahl VI,* 967 F.Supp. at 1313–14; *Remand Determination II* at 6–8.

In 1992, Commerce initiated separate countervailing duty investigations of Dillinger and Saarstahl. *See Certain Steel Prods. from Germany,* 58 Fed.Reg. 37,315 (Dep't Comm. July 9, 1993) (final affirm. determ.) ("*Final Steel Products*") (Dillinger); *Final Lead Bar,* 58 Fed.Reg. at 6233 (Saarstahl). Initially, in the Saarstahl investigation, Commerce classified the governments' abandonment of the RZVs as debt forgiveness, instead of grants bestowed in the years the RZVs were made. *See Final Lead Bar,* 58 Fed. Reg. at 6234, 6237. Commerce treated the amount of the debt forgiveness as a nonrecurring grant and calculated the benefit stream according to its grant methodology. *See id.* at 6233–34. Commerce also determined that the debt forgiveness by private banks constituted a countervailable subsi-

dy because "it was required by the government as part of a government-led debt reduction package ... and because the two governments guaranteed the future liquidity of [the company]." *Id.* at 6235. Finding that the subsidies benefited DHS because "the debt forgiveness was a condition for the creation of DHS," Commerce assessed countervailing duties against the products of both DHS subsidiaries. *Id.* at 6237.

Commerce's policy on repayment of subsidies during privatization transactions continued to evolve, however, and on July 9, 1993, it published its methodology for measuring subsidies that survive a privatization transaction. *See General Issues Appendix,* 58 Fed.Reg. 37,225, 37,259–73 (Dep't Comm. July 9, 1993). Commerce maintained that subsidies travel to a private or privatized company unless they are repaid, and announced methodologies for determining the amount of repayment. *See id.* Commerce then requested and received a remand in the Saarstahl case to apply its new privatization methodology. Commerce determined that the governments' RZV forgiveness was a subsidy benefiting SVK, which passed through to DHS during privatization to the extent the purchase price did not repay it. *See Remand Determination I* at 2–6; *see also General Issues Appendix,* 58 Fed.Reg. at 37,271–72. Commerce did not revisit its characterization of the RZVs' abandonment as debt forgiveness because that issue was beyond the scope of the remand. *See Remand Determination I* at 16–17.

Saarstahl appealed the determination to the Court of International Trade, which held that Commerce's privatization methodology was unlawful and developed a new one. *See Saarstahl AG v. United States,* 858 F.Supp. 187, 192–94 (Ct. Int'l Trade 1994) ("*Saarstahl I*"), *rev'd,* 78 F.3d 1539 (Fed.Cir.1996). The United States appealed this decision and we reversed because "the court did not accord sufficient defer-

ence to Commerce's approach" to evaluating the effect privatization has on prior subsidies. *See Saarstahl AG v. United States*, 78 F.3d 1539, 1544 (Fed.Cir.1996) ("*Saarstahl II*"). We remanded the case "because the court did not address all of the parties' arguments, including Commerce's request for a remand to review the agency's allocation of [SVK's] purchase price to repayment of prior subsidies and to assess [the company's] creditworthiness in 1989." *Id.* at 1544–45.

In response, the Court of International Trade remanded the case to Commerce, instructing it to follow *British Steel PLC v. United States*, 936 F.Supp. 1053 (Ct. Int'l Trade 1996) ("*British Steel IV*"), which maintains, based on *British Steel plc v. United States*, 924 F.Supp. 139, 155–58 (Ct. Int'l Trade 1996) ("*British Steel II*"), that our decision did not affect the viability of the court's privatization and repayment methodology. *See Saarstahl III*, 933 F.Supp. at 1106–07. Applying this methodology, Commerce determined that none of the subsidies were repaid because "DHS/Dillinger—the post-privatization entity—remained for all intents and purposes the same entity as SVK/DHS—the pre-privatization entity which received the subsidy." *Remand Determination II* at 10. Commerce also explained that it could impose countervailing duties on DHS's products, which includes the products of its subsidiary, Saarstahl, because "the benefits of the *debt forgiveness* were untied to any specific products." *Id.* at 13–17 (emphasis in original). The Court of International Trade sustained Commerce's application of that court's privatization methodology for the reasons set forth in

*British Steel IV*, 936 F.Supp. at 1066–68. *See Saarstahl IV*, 939 F.Supp. at 901. With this decision, the court indicated that it would address the non-privatization issues in "a future, separate opinion." *Id.* at 900.

Thereafter, the Court of International Trade addressed Saarstahl's Motion to Amend its Complaint to challenge Commerce's decision to allocate the benefits of the nonrecurring subsidies over fifteen years, based on United States tax tables, instead of the actual average useful life of the physical assets. Although it had struck down this methodology in *British Steel plc v. United States*, 879 F.Supp. 1254, 1298 (Ct. Int'l Trade 1995) ("*British Steel I*"), the court denied the motion because it came "so late in the proceeding that it would cause undue delay and unfairly prejudice the other parties." *Saarstahl V*, 949 F.Supp. at 866.

The parties then moved for a decision on the non-privatization issues. *See Saarstahl VI*, 967 F.Supp. at 1312–13. Saarstahl argued that (1) the RZVs "were not loans, (2) Commerce erred in calculating the value of the [RZVs], and (3) Commerce's determination that the private banks' debt forgiveness was a countervailable subsidy is not supported by substantial evidence on the record and is otherwise not in accordance with law." *Id.* at 1319. The court sustained Commerce's determination of these matters based on the reasoning in *British Steel IV*, 936 F.Supp. at 1069–71. *See Saarstahl VI*, 967 F.Supp. at 1319–20 & n. 8.[1] In addition, the court found that Commerce erred in failing to consider SVK's creditworthiness in 1989

---

1. *British Steel IV* held that (1) substantial evidence supports Commerce's determination that the abandonment of the RZVs in 1989 was a countervailable event in the form of debt forgiveness because the RZVs bore a repayment obligation, which is the hallmark of debt; (2) Commerce's valuation of the subsidy bestowed by this debt forgiveness was based on a reasonable interpretation of the

proposed regulation, noting that "the unencumbering of future profits was a benefit equal to the amount of the liability that was extinguished," which is the RZVs' face-value; and (3) Commerce's characterization of the private banks' debt forgiveness as a subsidy bestowed through government action was "based upon a permissible construction of the statute." 936 F.Supp. at 1069–71.

to determine whether to apply a risk premium to the debt forgiveness by Germany, Saarland, and the private banks. Therefore, the court again remanded the case. *See id.* at 1320–22.

On remand, Commerce determined that SVK was not creditworthy in 1989 by examining SVK's financial information for the three years prior to the receipt of the subsidy, which "[a]s a practical matter ... means ... the last three completed fiscal years." *Remand Determination III* at 2–4, 6. This information revealed that "the company was in very poor financial health." *Id.* at 3. Although Saarstahl argued that Commerce should have considered SVK's future financial prospects, such as the impending privatization, Commerce found that Saarstahl "never provided for the administrative record any market studies, country or industry economic forecasts or any other information regarding the company's prospects after privatization." *Id.* at 5. Saarstahl appealed the determination to the Court of International Trade, arguing that Commerce should have considered SVK's 1989 financial information and future prospects. *See Saarstahl VII,* 984 F.Supp. at 619. The court sustained the determination, however, because Commerce followed its proposed regulations, which permit but do not require examination of future financial prospects, and its findings were supported by substantial evidence. *See id.* at 619–20. The United States and Saarstahl appeal.

*Discussion*

■ "In reviewing a decision by the Court of International Trade to affirm the agency's final determination, we apply anew the court's statutorily-mandated standard of review to the administrative review." *Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369 (Fed.Cir.1998) (internal quotations omitted). Therefore, we must overturn Commerce's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "When Congress' intent is unclear, courts must sustain an agency's interpretation of a statute if it falls within the range of permissible construction. To sustain an agency's application of a statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Inland Steel Bar Co. v. United States,* 155 F.3d 1370, 1374 (Fed.Cir.1998) (internal quotations and citations omitted).

■ "[N]either the statute nor the legislative history offers guidance to Commerce in determining the amount of a prior subsidy, if any, that is repaid through the purchase price of a privatization." *British Steel PLC v. United States,* 127 F.3d 1471, 1475 (Fed.Cir.1997) (*"British Steel V"*). We have thrice held, however, that "with respect to this issue, Commerce's interpretation of the countervailing duty statute— namely, the repayment methodology in the *General Issues Appendix,* 58 Fed.Reg. at 37,259–73—is reasonable." *Inland Steel,* 155 F.3d at 1374; *see also British Steel V,* 127 F.3d at 1475; *Saarstahl II,* 78 F.3d at 1544.

In *Saarstahl I,* "the [trial] court did not accord sufficient deference to Commerce's" repayment methodology. *Saarstahl II,* 78 F.3d at 1544. In *British Steel I,* the trial court "further articulate[d] its reasoning and holding in *Saarstahl [I],*" 879 F.Supp. at 1270–74, and "imposed its own interpretation of the statute [on Commerce] by formulating an alternative test," *British Steel V,* 127 F.3d at 1475. As a result, it erred in *Saarstahl III* by instructing Commerce to follow this alternative test and in *Saarstahl IV* by sustaining Commerce's application of it. Therefore, we must reverse the Court of International Trade's judgment and remand the case so that the

court may determine whether Commerce accurately applied its repayment methodology in *Remand Determination I.*

■ Saarstahl has raised other challenges to the Court of International Trade's decision to sustain Commerce's determination that (1) the private banks' debt forgiveness bestowed a subsidy and (2) the RZVs were interest-free, contingent liability loans, the forgiveness of which bestowed a subsidy equaling their face-value. Saarstahl argues that its due process rights were violated because the Court of International Trade sustained Commerce's determination of these issues "by refus[ing] to consider any of [its] specific arguments ... and simply 'conclusively' apply[ing] ... its holding in *British Steel IV.*" We think it is clear that the court sustained Commerce's decision on these issues based on its reasoning in *British Steel IV,* 936 F.Supp. at 1069–71, and, upon consideration of the parties' arguments, we do the same. In reaching this conclusion, we recognize that Saarstahl's argument that the RZVs "constituted subsidies when first received and Commerce was required to begin the 15–year period for allocating the subsidy benefit in the year each subsidy payment was received rather than ... in 1989," when the loans were forgiven, differs slightly from Dillinger's challenge to the determination. This difference does not convince us, however, that the Court of International Trade erred in sustaining Commerce's decision. At best, Saarstahl offers an alternative methodology for allocating the subsidy received when interest-free, contingent liability loans are forgiven, but fails to demonstrate that Commerce's methodology is unreasonable.

■ Saarstahl also appeals the Court of International Trade's decision to deny its motion to amend its complaint. We cannot overturn this decision unless the court abused its discretion. *See Intrepid*

*v. Pollock,* 907 F.2d 1125, 1129 (Fed.Cir. 1990) ("An appeal from the denial of a motion to file an amended or supplemental pleading invokes an abuse of discretion standard of review."). The court concluded that the amendment in this case "would cause undue delay and unfairly prejudice the other parties," reasoning that "the debate over the proper allocation methodology [was] not a new issue" and that "[a]pplication of the new allocation methodology ... could warrant gathering new information and possibly verification," and, at any event, would require a remand to Commerce. *Saarstahl V,* 949 F.Supp. at 866–67. In light of these circumstances, we cannot say that the court abused its discretion.

Finally, Saarstahl appeals the Court of International Trade's decision to sustain Commerce's determination that SVK was uncreditworthy in 1989, arguing that Commerce should have considered SVK's 1989 financial information and future prospects. We have considered the arguments of all the parties and affirm on the basis of the trial court's opinion.

### Conclusion

Accordingly, the judgment of the Court of International Trade is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

PLAGER, Circuit Judge, concurs in the result.