BRITISH STEEL PLC, Plaintiff–
Appellant,

and

Government of the United Kingdom
of Great Britain and Northern
Ireland, Plaintiff,

v.

UNITED STATES, Defendant/Cross–
Appellant,

v.

BETHLEHEM STEEL CORPORATION,
Inland Steel Industries, Inc., and U.S.
Steel Group—A UNIT of USX Corpora-
tion, Defendants–Appellees,

and

Geneva Steel, Gulf States Steel Inc. of
Alabama, Lukens Steel Co., and Shar-
on Steel Corporation, Defendants.

USINAS SIDERURGICAS DE MINAS
GERAIS, S.A., Plaintiff,

and

Companhia Siderurgica
Nacional, Plaintiff,

v.

UNITED STATES, Defendant/Cross–
Appellant,

BETHLEHEM STEEL CORPORATION,
AK Steel Corporation, Inland Steel In-
dustries, Inc., LTV Steel Company, Inc.,
National Steel Corporation, and U.S.
Steel Group—A Unit of USX Corpora-
tion, Defendants–Appellees,

and

Gulf States Steel, Inc. of Alabama, Ge-
neva Steel, Lukens Steel Co., and
WCI Steel Inc., Defendants.

ALTOS HORNOS DE MEXICO, S.A.
DE C.V., Plaintiff–Appellant,

v.

UNITED STATES, Defendant/Cross–
Appellant,

v.

BETHLEHEM STEEL CORPORATION,
AK Steel Corp., Inland Steel Industries,
Inc., LTV Steel Company, Inc., National
Steel Corporation, and U.S. Steel
Group—A Unit of USX Corporation, De-
fendants–Appellees,

and

Lukens Steel Company, Gulf States Steel
Inc., of Alabama, Sharon Steel Corpora-
tion, WCI Steel Inc., and Geneva Steel,
Defendants.

Nos. 96–1401, 96–1402, 96–1404,
96–1405 and 96–1406.

United States Court of Appeals,
Federal Circuit.

. Oct. 24, 1997.

Richard O. Cunningham and Peter Lichtenbaum, Steptoe & Johnson LLP, Washington, DC, argued for plaintiff-appellant British Steel PLC. With them on brief were Sheldon E. Hochberg and William L. Martin, III.

A. David Lafer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant/cross-appellant United States. With him on brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on brief were Stephen J. Powell, Chief Counsel, John D. McInerney, Senior Counsel, Elizabeth C. Seastrum Senior Counsel, Robert E. Nielsen, Senior Attorney, and David J. Ross, Attorney–Adviser, Office of the Chief Counsel for Import Administration, Department of Commerce, Washington, DC

Stephen J. Narkin, Skadden, Arps, Slate, Meagher & Flom LLP, Washington DC, and John A. Ragosta, Dewey Ballantine, Washington, DC, argued for defendants-appellees Bethlehem Steel Corporation, et al. With them on brief were Robert E. Lighthizer and John J. Mangan, Skadden, Arps, Slate, Meagher & Flom LLP; and Michael H. Stein, Guy C. Smith, and John R. Magnus, Dewey Ballantine. Of counsel were Michael R. Geroe and David S. da Silva Cornell, Dewey Ballantine; and D. Scott Nance, Skadden, Arps, Slate, Meagher & Flom LLP.

Kermit W. Almstedt, O'Melveny & Myers LLP, Washington, DC, for Altos Hornos de Mexico, S.A. de C.V. Of counsel was Michael A. Meyer. On brief was Jeffrey M. Winton, Shearman & Sterling, of Washington, DC.

Before MAYER, RADER, and SCHALL, Circuit Judges.

MAYER, Circuit Judge.

Altos Hornos de Mexico, S.A. de C.V. ("AHMSA"), British Steel plc ("BS plc"), and the United States appeal the judgment of the Court of International Trade, Consol. Court Nos. 93–09–00550, 93–09–00558, and 93–09–00570 (April 2, 1996), *British Steel plc v. United States*, 924 F.Supp. 139 (C.I.T.1996) (*"British Steel II"*), affirming the final determination of the United States Department of Commerce ("Commerce") in *Certain Steel Products from the United Kingdom,* 58 Fed. Reg. 37,393 (July 9, 1993) (final affirmative countervailing duty determination), as modified on remand in *Remand Determination: Certain Steel Products from the United Kingdom* (July 17, 1995); in *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (July 9, 1993) (final affirmative countervailing duty determination), as modified on remand in *Remand Determination: Certain Steel Products from Brazil,* (July 17, 1995); and in *Certain Steel Products from Mexico,* 58 Fed. Reg. 37,352 (July 9, 1993) (final affirmative countervailing duty determination) (*"Mexico Determination"*), as modified on remand in *Remand Determination: Certain Steel Products from Mexico* (July 17, 1995). Appellants also contest various aspects of the Court of International Trade's February 9, 1995, order, *British Steel plc. v. United States,* 879 F.Supp. 1254 (C.I.T.1995) (*"British Steel I "*), remanding the final determinations to Commerce.* We reverse in part because the Court of International Trade erred in sustaining Commerce's *Remand Determinations,* affirm in part because it correctly sustained Commerce's use of the mortgage-based loan methodology, and remand the case for a determination of whether Commerce correctly applied its repayment methodology in the initial final determinations.

### Background

On July 9, 1993, Commerce published its final affirmative determination in the countervailing duty investigations of certain steel products from various countries, including Brazil, Mexico, and the United Kingdom. Commerce determined that before USIMINAS, AHMSA, and BS plc were privatized, each company (or its corporate predecessor) received past non-recurring subsidies from the governments of Brazil, Mexico, and the United Kingdom, respectively. *British Steel I,* 879 F.Supp. at 1264, 1277, 1280. In each case, because the privatization transaction involved payments to the company's respective government, Commerce examined whether it could continue to consider the privatized company a recipient of a subsidy under the countervailing duty statute, 19 U.S.C. § 1671(a) (1988),** or whether the privatization completely repaid the subsidies. *General Issues Appendix,* 58 Fed.Reg. 37,-

---

* The Brazilian companies, Usinas Siderurgicas de Minas Gerais, S.A. et al. (USIMINAS), have not appealed the judgment of the Court of International Trade in Consol. Court No. 93–09–00558. Although the Court of International Trade sustained Commerce's action in *Remand Determination: Certain Steel Products from Brazil* (July 17, 1995), the United States has, in effect, appealed the Court of International Trade's February 9, 1995, order remanding its final determination, *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (July 9, 1993). The appellees assert that the United States lacks standing to appeal the April 2, 1996, decision because this decision was not adverse to the United States. Although typically a party cannot appeal a favorable ruling, there are exceptions. *See, e.g., Farmer v. McDaniel,* 98 F.3d 1548, 1553 (9th Cir.1996) (allowing the state of Nevada to appeal a decision that "it will never have another opportunity to have ...

reviewed"); *Dolenc v. Love,* 40 F.3d 656, 657 (3d Cir.1994) (where a decision would be law of the case or the basis for collateral estoppel, the prevailing party has standing); *LaBuhn v. Bulkmatic Transp. Co.,* 865 F.2d 119, 122 (7th Cir.1988) ("[Y]ou can appeal from the parts of a generally favorable order that are unfavorable to you...."). At least because this is the only opportunity for the United States to appeal the February 9, 1995, adverse ruling, we hold that it has standing.

** On December 8, 1994, Congress passed the Uruguay Round Agreements Act of the General Agreement on Tariffs and Trade, which changed the countervailing duty statute. *See* Pub.L. No. 103–465 (1994). Our decision is based on the statutory scheme prior to this amendment, and our references are to that version of the statute.

225, 37,261 (July 9, 1993) ("*General Issues Appendix*").

Commerce found that "privatization of a government-owned company, *per se*, does not and cannot eliminate [the] countervailability" of a subsidy provided before privatization, except to the extent that the sale included the subsidy's repayment. *Id.* at 37,263. In addition, Commerce developed a repayment methodology to determine the amount of the past non-recurring subsidies that the privatization transaction repaid. Under the repayment methodology, Commerce determines what percentage of the subsidized company's net worth is attributable to a past non-recurring subsidy and allocates, based on this percentage, a portion of the company's purchase price to subsidy repayment. *Id.* Commerce applied this methodology to the privatization of AHMSA, BS plc, and USIMINAS. *Id.* at 37,297, 37,355, 37,394.

On February 9, 1995, the Court of International Trade rejected Commerce's determination to the extent that it held that "subsequent to any privatization transaction, Commerce may countervail a privatized company for pre-privatization subsidies regardless of how privatization takes place." *British Steel I,* 879 F.Supp. at 1276. The Court of International Trade reasoned that because the recipient of a subsidy must be a person or corporate entity, the focus of the repayment inquiry should be whether the entity that received the subsidy survives the privatization. *Id.* at 1271–72. In the Court of International Trade's view:

> [W]here a private investor pays fair market value in an arm's-length transaction based upon commercial considerations for an asset or assets of a corporation, "there is no benefit conferred to the purchaser and therefore, no countervailable subsidy within the meaning of 19 U.S.C. § 1677(5)." ... If, however, a purchaser buys into the subsidized corporate entity itself so that the subsidized entity continues in its corporate existence in whole or in part, Commerce may properly continue to countervail that entity in accordance with legislative intent.

*Id.* at 1274 (quoting *Saarstahl AG v. United States,* 858 F.Supp. 187, 193 (C.I.T.1994), *rev'd,* 78 F.3d 1539 (Fed.Cir.1996)). The Court of International Trade declined to rule on the issue of Commerce's repayment methodology and remanded the case instructing Commerce to determine whether the transaction was an asset or stock sale, and whether each privatization was at arm's length, for fair market value, and consistent with commercial considerations. The Court of International Trade also instructed Commerce to calculate any countervailing duties that were still warranted under the new standard. *Id.* at 1277, 1329.

Although Commerce disagreed with the court's instructions, it nevertheless made the requisite findings in its *Remand Determinations* (July 17, 1995) ("*Remand Determinations*"). In the *Remand Determinations,* Commerce found that it could properly countervail the exports of AHMSA, BS plc, and USIMINAS mainly because these companies were for "all intents and purposes" the same entities as the ones before privatization. *British Steel II,* 924 F.Supp. at 165–66, 174, 184. Commerce did not apply the repayment methodology, however, "in an attempt to follow the spirit of the Court's decision" in *British Steel I. Remand Determinations* at 7, n.7. In calculating the countervailing duty owed by AHMSA, Commerce amortized the amount of the subsidy by using a mortgage-based loan methodology instead of its customary declining balance (grant) and dollarization methodologies to account for Mexico's intermittent periods of hyperinflation. *British Steel II,* 924 F.Supp. at 166–67; *see also Mexico Determination,* 58 Fed.Reg. at 37,-355.

The Court of International Trade sustained these aspects of the *Remand Determinations* as supported by substantial evidence and otherwise in accordance with law. *British Steel II,* 924 F.Supp. at 190–91. The court also held that Commerce had advanced a reasoned analysis for abandoning its customary grant and dollarization methodologies and that the mortgage-base loan methodology was based on substantial evidence and

otherwise in accordance with law. *Id.* at 168. These appeals followed.

*Discussion*

■ The first issue is whether the Court of International Trade correctly sustained Commerce's *Remand Determinations.* Courts must sustain an agency's interpretation of a statute if it "falls within the range of permissible construction." *Daewoo Elecs. v. International Union,* 6 F.3d 1511, 1516 (Fed. Cir.1993) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 667 (Fed.Cir.1992)); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). "To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)); *Saarstahl AG v. United States,* 78 F.3d 1539, 1542 (Fed.Cir.1996).

■ The parties and the Court of International Trade agree that neither the statute nor the legislative history offers guidance to Commerce in determining the amount of a prior subsidy, if any, that is repaid through the purchase price of a privatization. *British Steel I,* 879 F.Supp. at 1271. Our precedent recognizes, however, that a subsidy may pass to a privatized company during an arm's length transaction. *Saarstahl AG v. United States,* 78 F.3d at 1544. Moreover, the methodology developed by Commerce to account for the repayment of subsidies during privatization is a reasonable interpretation of the countervailing duty statute. *Id.* None of the arguments presented here makes these propositions doubtful. "In the absence of explicit [legislative] mandates ... Commerce's approach must be accorded deference." *Id.*

■ In *British Steel I,* the Court of International Trade did not give proper deference to Commerce's repayment methodology. Instead of reviewing the methodology, the court impermissibly imposed its own interpretation of the statute by formulating an alternative test. The court erred in *British Steel II,* therefore, in sustaining Commerce's application of this alternative test. Because the Court of International Trade did not determine whether Commerce accurately applied its repayment methodology to the privatizations, we remand the case to give the court that opportunity.

■ The next issue is whether the Court of International Trade correctly sustained Commerce's allocation of AHMSA's past non-recurring subsidies by using the mortgage-based loan methodology. "An agency is obligated to follow precedent, and if it chooses to change, it must explain why." *M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce,* 729 F.2d 748, 755 (Fed.Cir. 1984); *see also Atchison, Topeka & Santa Fe Ry. v. Wichita Bd.,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973). Commerce agrees that "before a change is made in established policy there should be evidence to show that the change is warranted." *General Issues Appendix,* 58 Fed.Reg. at 37,229. Once an agency justifies its change with sufficient, reasoned analysis, however, the revised policy deserves the same deference as the original policy. *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991). We cannot overturn Commerce's new methodology unless it is unreasonable. *Koyo Seiko Co., Ltd. v. United States,* 66 F.3d 1204, 1210 (Fed.Cir.1995); *see Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1039 (Fed.Cir. 1996) (The deference to Commerce's countervailing duty determinations is "both greater than and distinct from that accorded to the agency in interpreting the statutes it administers.").

Commerce has explained that it declined to use the customary grant methodology because it would not account for the intermittent periods of hyperinflation in Mexico

during the allocation period. *Mexico Determination*, 58 Fed.Reg. at 37,355. Further, Commerce could not apply its customary dollarization methodology because it assumes that hyperinflation occurred throughout the allocation period. Because the Mexican hyperinflation was intermittent, dollarization would "inflate the benefit" of the subsidies. *Id.* For these reasons, Commerce abandoned these customary methodologies in favor of a mortgage-based loan methodology, which accounts for the intermittent hyperinflation. *Id.*

According to AHMSA, the mortgage-based loan methodology differs from the declining balance methodology in two ways: (1) it uses a variable interest rate instead of a fixed interest rate, and (2) it repays the principle in graduated instead of equal installments. AHMSA argues that Commerce must articulate a reason for both changes and that Commerce has explained only the change in interest rate. Commerce has sufficiently explained, however, that its customary methodologies did not account appropriately for the intermittent hyperinflation. This explanation justifies the abandonment of the methodologies. AHMSA's assertion that Commerce must advance additional reasons for changing each of the assumptions underlying an abandoned methodology is a veiled attempt to challenge the reasonableness of the replacement methodology. Once Commerce demonstrated that it was necessary to abandon a particular methodology, it was free to choose any other reasonable methodology. Because the mortgage-based loan methodology is a reasonable way of accounting for intermittent hyperinflation, the Court of International Trade properly deferred to Commerce's interpretation.

### Conclusion

Accordingly, the judgment of the Court of International Trade is reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion.

### COSTS

Each party shall bear its own costs.

*REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.*