**INLAND STEEL BAR CO.,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant**
Cross–Appellant,

v.

**UNITED ENGINEERING STEELS, LTD.,**
(now British Steel Engineering Steels, Limited) Defendant–Appellee.

Nos. 97–1257, 97–1334.

United States Court of Appeals,
Federal Circuit.

Sept. 18, 1998.

Charles Owen Verrill, Jr., Wiley, Rein & Fielding, Washington, DC, argued for plaintiff-appellant. With him on the brief was Willis S. Martyn, III. Of counsel were Alan H. Price and Peter S. Jordon.

A. David Lafer, Senior Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, argued for defendant cross-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief was Stephen J. Powell, Chief Counsel, U.S. Department of Commerce. Also of counsel on the brief were John D. McInerney, Senior Counsel, Elizabeth C. Seastrum, Senior Counsel, and Robert E. Nielsen, Senior Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC. Of counsel was David J. Ross, U.S. Department of Commerce, Washington, DC.

Sheldon E. Hochberg, Steptoe & Johnson LLP, Washington, DC, argued for defendant-appellee. With him on the brief were Richard O. Cunningham and Peter Lichtenbaum.

Mark R. Joelson, Morgan, Lewis & Bockius LLP, Washington, DC, for amicus curiae The United Kingdom of Great Britain and Northern Ireland. With him on the brief was Gregory S. Menegaz.

Before MAYER, Chief Judge, SKELTON, Senior Circuit Judge, and PLAGER, Circuit Judge.

Opinion for the court filed by Chief Judge MAYER. Concurring in part and dissenting in part opinion filed by Circuit Judge PLAGER.

MAYER, Chief Judge.

Inland Steel Bar Co. ("Inland Steel") and the United States appeal the judgment of the Court of International Trade, Consol. *Inland Steel Bar Co. v. United States*, 960 F.Supp. 307 (CIT 1997) ("*Inland Steel IV*"), affirming the final determination of the United States Department of Commerce ("Commerce") in *Certain Hot Rolled Lead and Bismuth Carbon Steel Prods. from the United Kingdom*, 58 Fed.Reg. 6237 (Dep't Comm. Jan. 27, 1993), as modified on remand in *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Prods. from the United Kingdom Pursuant to Inland Steel Bar Co. v. United States*, Slip Op. 96–134 (CIT Aug. 13, 1996) (Sept. 13, 1996) ("*Remand Determination II*"). They also appeal the Court of International Trade's order in *Inland Steel Bar Co. v. United States*, 936 F.Supp. 1052 (CIT 1996) ("*Inland Steel III*"), remanding the case to Commerce. We reverse and remand.

*Background*

In 1986, British Steel Corp., a United Kingdom, government owned company (privatized in 1988 as British Steel, PLC), and Guest, Keen and Nettlefolds, a privately-owned, British company, established United Engineering Steels Ltd. ("United Engineering") as a joint venture. British Steel Corp.

contributed its Special Steel Division ("Division") to United Engineering in return for stock in the joint venture. Commerce found that British Steel Corp.'s transfer of the Division to United Engineering was at arm's-length on terms consistent with commercial considerations and that United Engineering was a separate entity not controlled by British Steel Corp.[1] *See Certain Hot Rolled Lead and Bismuth Carbon Steel Prods. from the United Kingdom*, 58 Fed.Reg. 6237, 6240 (Dep't Comm. Jan. 27, 1993) (*"Final Determination"*). Nevertheless, because British Steel Corp. received government subsidies from 1977–82, *see British Steel Corp. v. United States*, 605 F.Supp. 286, 289, 294–95 (CIT 1985), Commerce examined whether any of these subsidies traveled with the Division to United Engineering. Commerce initially determined that "a company's sale of 'business' or 'productive unit' does not alter the effect of previously bestowed subsidies." *Final Determination*, 58 Fed.Reg. at 6240. Because it found that the Division is a productive unit, it determined that the portion of British Steel Corp.'s subsidies attributable to the Division traveled to United Engineering. Commerce measured United Engineering's resulting subsidy as "an *ad valorem* subsidy of 12.69 percent." *See id.* at 6241.

Commerce's policy on repayment of subsidies during privatization transactions continued to evolve. On July 9, 1993, Commerce published the *General Issues Appendix*, 58 Fed.Reg. 37,225, 37,259–73 (Dep't Comm. July 9, 1993), which affirmed its previous position that subsidies can travel to a private or privatized company and announced repayment methodologies for determining what portion of the subsidies is repaid and thereby extinguished. *See id.* Because it did not take into consideration whether a part of the Division's purchase price repaid a portion of the prior subsidies, Commerce requested and on September 20, 1993, received a remand from the Court of International Trade to address this issue.

On remand, Commerce determined that although the portion of British Steel Corp.'s subsidies attributable to the Division traveled to United Engineering, some of these subsidies were repaid by the Division's purchase price. *See Certain Hot Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom*, 58 Fed.Reg. 6237 (Dep't Comm. Jan. 27, 1993), as modified on remand in *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Prods. from the United Kingdom* (Oct. 10, 1993) (*"Remand Determination I"*). Commerce explained that this approach is "consistent with its position on privatization in [*Certain Steel Prods. From the United Kingdom*, 58 Fed.Reg. 37,393 (Dep't Comm. July 9, 1993) (final countervailing duty determination)] that the purchase price paid for all or part of a government-owned company can, at least in part, constitute repayment of prior subsidies." *Remand Determination I* at 1–2; *see also General Issues Appendix*, 58 Fed.Reg. at 37,262–63.

To determine the amount of the repayment, Commerce applied a repayment methodology that it had developed in the *General Issues Appendix*, 58 Fed.Reg. at 37,259–73. Commerce first calculated the amount of the potential pass-through subsidies, or the amount of subsidies that the Division possibly could have taken with it to United Engineering, by multiplying the ratio of the book value of the Division's assets to the book value of British Steel Corp.'s assets and "the net present value in the year of the spin-off of the future subsidy benefit streams from [British Steel Corp.]'s prior subsidies." To estimate the portion of the Division's purchase price attributable to these prior subsidies, Commerce divided the face value of the allocable subsidies received by British Steel Corp. by its net worth for each year it had received a subsidy prior to selling off the Division. Commerce applied the average of these ratios to the Division's purchase price and subtracted this amount from the total

---

**1.** United Engineering has since become "a wholly-owned subsidiary of British Steel[, PLC] in March 1995," *EU Challenge on U.S. CVD Order*

*Must be Vigorously Defended, Hatch Says*, 15 Int'l Trade Rep. 1358, 1358 (1998), and has been renamed British Steel Engineering Steels Ltd.

potential pass-through subsidies to arrive at the amount of the subsidies that traveled to United Engineering in 1986. Finally, Commerce determined the benefit allocable to United Engineering in 1991, the period of investigation, by dividing the traveled subsidies by "the net present value in the year of the spin-off of the future benefit streams from subsidies received by [British Steel Corp.] prior to the spin-off" and multiplying this percentage by "the total amount of the subsidies that would have been allocated to [British Steel Corp.] in 1991 absent any subsequent spin-offs or privatization." Commerce then divided the benefit allocable to United Engineering in 1991 by its total sales in 1991 to arrive at an *ad valorem* subsidy of 4.59%. *See Remand Determination I* at 2–4.

United Engineering appealed this determination to the Court of International Trade. Relying heavily on its reasoning in *Saarstahl AG v. United States,* 858 F.Supp. 187, 193 (CIT 1994) ("*Saarstahl I*"), *rev'd,* 78 F.3d 1539 (Fed.Cir.1996) ("*Saarstahl II*"), the court held that the arm's-length nature of the transaction prevented the subsidies from traveling with the production unit. *See Inland Steel Bar Co. v. United States,* 858 F.Supp. 179, 186 (CIT 1994) ("*Inland Steel I*") ("Once a productive unit has been sold in an arm's length transaction at fair market value, Commerce must look to the subsidy recipient, in this case [British Steel Corp.], and reallocate the subsidy over the remaining business."). Inland Steel appealed to this court. We reversed and remanded "[f]or the reasons set forth in our opinion in *Saarstahl [II]." Inland Steel Bar Co. v. United States,* 86 F.3d 1174 (Fed.Cir.1996) (nonprecedential) ("*Inland Steel II*").

On remand, the Court of International Trade instructed Commerce to determine whether the Division was "a productive unit capable of receiving a subsidy" based on the test developed in *British Steel plc v. United States,* 879 F.Supp. 1254 (CIT 1995) ("*British Steel I*") and *British Steel plc v. United*

*States,* 924 F.Supp. 139 (CIT 1996) ("*British Steel II*").[2] *Inland Steel III,* 936 F.Supp. at 1052–53. On remand, Commerce continued to use the definition of "productive unit" given in the *General Issues Appendix,* 58 Fed.Reg. at 37,268—namely, an operation capable of "(1) generating sales and (2) operating independently"—and continued to classify the Division as a productive unit. Commerce further explained that under *British Steel I & British Steel II,* only a person or artificial person that is capable of holding a property interest is capable of receiving a subsidy. In the *British Steel* line of cases, the Court of International Trade explained:

> where a private investor pays fair market value in an arm's-length transaction based upon commercial considerations for an asset or assets of a corporation, "there is no benefit conferred to the purchaser and therefore, no countervailable subsidy within the meaning of 19 U.S.C. § 1677(5)." ... If, however, a purchaser buys into the subsidized corporate entity itself so that the subsidized entity continues in its corporate existence in whole or in part, Commerce may properly continue to countervail that entity in accordance with legislative intent.

*British Steel I,* 879 F.Supp. at 1274 (quoting *Saarstahl I,* 858 F.Supp. at 193). Based on its finding that the Division was not a legal entity and therefore not an artificial person, Commerce determined that the Division was not capable of receiving a subsidy. It thus concluded that British Steel Corp.'s subsidies did not travel with it to United Engineering and revised "the 4.59 percent *ad valorem* rate for United Engineering ... determined under Commerce's privatization/repayment methodology ... to an *ad valorem* rate of 0.0 percent." *Remand Determination II* at 2–5.

Inland Steel appealed this determination to the Court of International Trade which affirmed, reiterating its interpretation of 19

---

2. We subsequently reversed both these judgments. *See British Steel PLC v. United States,*

127 F.3d 1471 (Fed.Cir.1997).

U.S.C. § 1677(5)(B) and 1671(a)(1)(B)(1988) as requiring that subsidies be held by only persons or artificial persons. *See Inland Steel IV,* 960 F.Supp. at 313. In the Court of International Trade's view, "a key issue in determining whether a countervailable subsidy exists is whether the entity in question is organized in such a manner that it is capable of receiving and absorbing a property interest, and therefore is capable of receiving a countervailable subsidy." *Id.* Inland Steel appeals.

## Discussion

■ When Congress' intent is unclear, courts must sustain an agency's interpretation of a statute if it "falls within the range of permissible construction." *Daewoo Elecs. Co. v. International Union of Elec., Elec., Technical, Salaried and Mach. Workers,* 6 F.3d 1511, 1516 (Fed.Cir.1993) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 667 (Fed.Cir. 1992)); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)); *see also Saarstahl II,* 78 F.3d at 1542.

"[N]either the statute nor the legislative history offers guidance to Commerce in determining the amount of a prior subsidy, if any, that is repaid through the purchase price of a privatization." *British Steel PLC v. United States,* 127 F.3d 1471, 1475 (Fed. Cir.1997) (*"British Steel III"*). We have twice held, however, that with respect to this issue, Commerce's interpretation of the countervailing duty statute—namely, the repayment methodology in the *General Issues Appendix,* 58 Fed.Reg. at 37,259–73—is reasonable. *See British Steel III,* 127 F.3d at 1475; *Saarstahl II,* 78 F.3d at 1544. Even if we wanted to reevaluate our decision, we could not. *See Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed.Cir.1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc.*").

■ Notwithstanding, we remain firm in our conviction that Commerce's interpretation of the statute is reasonable. When a subsidized company offers a productive unit for sale, the offer includes (1) an asset—the productive unit—and (2) a liability—an obligation to pay countervailing duties. Under Commerce's interpretation of the countervailing duty laws, the subsidized company cannot offer the asset without the liability because it would frustrate the countervailing duty laws. As a result, the purchase of a subsidized company's productive unit is not the same as the purchase of a private company's productive unit. The fair market value of a subsidized company's productive unit will depend not only on the intrinsic value of the unit, but also on whether the purchaser opts to discharge the liability at purchase time rather than continuing to pay countervailing duties until the obligation expires. Commerce's methodology for determining the amount of a subsidy that is repaid when a subsidized, state-owned company privatizes one of its productive units "correctly recognizes that a number of scenarios are possible: the purchase price paid by the new, private company might reflect partial repayment of the subsidies, or it might not." *Saarstahl II,* 78 F.3d at 1544. Determining that the purchaser paid "fair market value" does not end the inquiry unless it is clear that the fair market purchase price completely discharged the liability. Commerce has taken the reasonable position that, in the absence of evidence to the contrary, the purchase price partially discharges the liability because it partially repays the subsidies.

This approach is consistent with its methodology for determining the amount of the repayment when a company is privatized

through the sale of shares and eliminates the potential for circumvention of countervailing duties under the Court of International Trade's "assets-vs.-stock" theory. If a subsidized company could sell its assets free from liability for countervailing duties, then it would opt for this method of privatization over a stock sale, which leaves the privatized company liable for countervailing duties based on the amount of the subsidies that were not repaid. After selling off their assets, these "virtually empty corporate shell[s]" would no longer be subject to the countervailing duty laws because they could no longer "produce or export the counter-vailed merchandise." *Final Determination,* 58 Fed.Reg. at 6240. The domestic industries would suffer, however, because the subsidized company's sold-off production units would continue to produce and export merchandise, but this merchandise would no longer be subject to countervailing duties. By treating privatization through stock and asset sales the same, Commerce's methodology prevents this type of circumvention.

"In the absence of specific [legislative] mandates ... Commerce's approach must be accorded deference." *British Steel III,* 127 F.3d at 1475 (quoting *Saarstahl II,* 78 F.3d at 1544). In *Inland Steel I,* the Court of International Trade did not give proper deference to Commerce's reasonable methodology for determining the amount of a subsidy that is repaid when a subsidized, state-owned company privatizes one of its productive units. In *Inland Steel III,* the court aggravated this error by selectively following our mandate in *Inland Steel II,* where we directed the court to follow *Saarstahl II. See Inland Steel II,* 1996 WL 168937 at *1. By narrowly reading *Saarstahl II* to hold only "that previously bestowed subsidies cannot be disqualified as a matter of law from passing through to a subsequent transferee in an arm's length transaction," *Inland Steel IV,* 960 F.Supp. at 314, the court ignored our clear statement that "Commerce's approach was reasonable and should not have been disturbed," *Saarstahl II,* 78 F.3d at 1544. We recognize that the court did not have the benefit of *British Steel III* when it remanded this case to Commerce. Nevertheless, as in *British Steel III,* the Court of International Trade impermissibly imposed its own interpretation of the statute on Commerce in *Inland Steel III* and thus erred in *Inland Steel IV* in sustaining Commerce's application of this alternative test.

Because the Court of International Trade has yet to determine whether Commerce accurately applied its repayment methodology to the Division's sale to United Engineering, we remand the case for the court to do so. We emphasize, however, that the court should examine only whether substantial evidence supports Commerce's application of the repayment methodology; it should not revisit Commerce's interpretation of the statute.

## Conclusion

Accordingly, the judgment of the Court of International Trade is reversed and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*

PLAGER, Circuit Judge, concurring in part and dissenting in part.

I believe the approach that Commerce has taken in these cases regarding the application of countervailing duties to foreign privatizations is wrong, wrong both as a matter of statutory construction and as a matter of United States economic policy. The panel majority, citing its earlier opinion in *Saarstahl AG v. United States,* 78 F.3d 1539 (Fed.Cir.1996) ("*Saarstahl II* "), reverses the Court of International Trade, and supports Commerce's position largely as a matter of deference to the agency.

Amidst the welter of agency determinations, remands, prior reversals and earlier opinions in this case, it is easy to lose sight of the big picture. The big picture is simply this: "the purpose of the countervailing duty law is 'to offset the unfair competitive advan-

tage that foreign producers would otherwise enjoy from export subsidies paid by their governments.'" *Saarstahl II,* 78 F.3d at 1547 (Plager, J., dissenting) (quoting *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978)). The purpose is to ensure that products entering United States markets are not benefited by government subsidies. By increasing the market price of imported goods, countervailing duties help to ensure that competition in the American marketplace is fair. It makes little sense to use the countervailing duty law to punish foreign producers or foreign governments for past governmental errors involving subsidization of the means of production, unrelated to current imports or current markets.

If a previously subsidized government asset, such as a manufacturing plant, is sold to a private producer in an arm's length transaction for fair market value, the *future* products produced at the plant and imported into the United States by the private producer are no more "subsidized" than if the plant had been purchased from a private seller. If the plant is purchased from a private seller at fair market value, there of course would be no countervailing duty. When the plant is purchased from a seller who previously received government subsidies, but is purchased in an arms length transaction for fair market value, the future products produced therein and exported to the United States in competition with American products are in no sense "subsidized" simply because of the way in which the asset was originally created. The private producer who purchases the plant pays the same price regardless of who the seller is. Thus there is no basis for imposing a countervailing duty on newly-imported products based on the origin of the plant.

Obviously, a key consideration is a determination of whether the sale of the government asset to the private producer somehow carries with it a financial benefit to that producer, one that will affect future production, that a free market economy would not have granted. In the case at bar, Commerce specifically found that the asset sale was at fair market value, in an arms length transaction. The Court of International Trade had correctly concluded that, in such circumstances, the arbitrary imposition of a countervailing duty on the importation of future production was not within the statutory authority of the agency.

The panel majority explains Commerce's interpretation of the statute as based on the theory that "[w]hen a subsidized company offers a productive unit for sale, the offer includes (1) an asset—the productive unit— and (2) a liability—an obligation to pay countervailing duties." *See* slip op. at 1374. If by "productive unit" is meant ownership of an intangible, a corporate entity with assets and liabilities, and those liabilities include the burden of prior subsidization, then obviously those liabilities are now the responsibility of the new owner, and Commerce can take that into account in some fashion. But if, as here, "productive unit" means a specific physical asset such as a steel plant, such an asset has only value, a market price. When that price is paid in an arms length transaction by a new owner, it is difficult to understand why future production by the new owner would carry the burden of the prior subsidization. (I suppose it is possible that there are prior assessed duties for past imports, still owed by the corporate entity, but that is a matter of debt collection, not countervailing duties against a new producer, and nothing in the record before us suggests that is at issue.)

The panel majority is concerned that if a subsidized foreign company could sell its assets free from liability for future countervailing duties, then foreign government privatization would take that course. *See id.* at 1374–75. We would be left with virtually empty, non-operating government-corporate shells no longer subject to the imposition of United States countervailing duties. *See id.* Again, assuming the problem is not one of past debt collection, I can only respond, Hooray !! That is the whole point of the effort to encourage foreign governments to cease engaging in subsidized production, which subsidization made products liable to countervail-

ing duties upon importation into this country. By selling off their assets to private enterprise, these government-subsidized producers put themselves out of business. When the purchase of those assets imposes the same capital burdens on new private producers as any other privately-created assets would, we end up with products that can fairly compete in open markets, and governments that stay out of the marketplace.

The purpose of the countervailing duty law is not to punish previous subsidization, but to support free and open competition. The statute does not dictate how that is to be done in the context of these privatization cases. The approach taken by Commerce, and now approved by this court and made applicable to all cases of this class, is counterproductive to that purpose because it punishes efforts at privatization when there is no evidence that future production resulting from the privatization of those assets is in any way anti-competitive or unfair to American producers.

Countervailing duty cases present Commerce with the difficult task of applying an elaborate statutory scheme to complex factual matters involving international business practices. The agency is charged with the duty of protecting American business from unfair competition from abroad; it is understandable that interested domestic enterprises may urge Commerce to pursue its mission with zeal. The agency, with the benefit of a large staff, has developed a degree of expertise in these matters which entitles it to a certain amount of deference in its handling of the issues with which it is charged.

Yet, Congress chose to make the agency's decisions subject to judicial review, first in a trial court which itself has expertise in these matters, and then in a court of appeals. Though appellate judges have neither technical expertise nor large staffs, it is our duty to make an independent assessment of the correctness of the agency's understanding of the

law, and its application to the particular case before it.

In this case, two of the four judges who put their minds to it—the trial judge and I—believe that Commerce misunderstood its Congressional mandate, and thus misapplied the law to these facts. My two colleagues disagree, and so the case is decided. Because of its significance to United States policy with regard to foreign governments and our efforts to promote free market economies world-wide, I have written separately.

In sum, I concur in the result reached by the majority only to the extent that it is consistent with, and perhaps driven by, the majority opinion in *Saarstahl II*, and thus arguably controlled by our precedent. *See also British Steel PLC v. United States,* 127 F.3d 1471 (Fed.Cir.1997). (But see my dissent in *Saarstahl II,* 78 F.3d at 1546, noting that both parties sought remand and the court reached issues that neither party wished to have addressed. *See also Inland Steel Bar Co. v. United States,* 86 F.3d 1174, 1996 WL 168937, at *1 (Fed.Cir.1996) (Plager, J., dissenting) (nonprecedential).) Absent an *in banc* reversal by this court, it may take attention by the Supreme Court, or eventually Congress, before the matter can be set straight.

I otherwise dissent on the basis of my dissent in *Saarstahl II*. On the record before us, I would affirm the decision of the Court of International Trade.