**BRITISH STEEL PLC, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Usinas Siderurgicas de Minas Gerais, S.A., et al., Plaintiffs,**

v.

**United States, Defendant.**

**Lukens Steel Co., Inc., et al., Plaintiffs,**

v.

**United States, Defendant.**

**Slip Op. 98–144.**
**Court Nos. 93–09–00550–CVD,**
**93–09–00558–CVD, and**
**93–09–00570–CVD.**

United States Court of
International Trade.

Oct. 14, 1998.

Steptoe & Johnson, LLP (Richard O. Cunningham, Sheldon E. Hochberg, William L. Martin, II, Peter Lichtenbaum), Washington, D.C., for plaintiff British Steel PLC; Willkie, Farr & Gallagher (William H. Barringer, Christopher S. Stokes), Washington, D.C., for plaintiff Usinas Siderugicas de Minas Gerais S.A.; O'Melveny & Myers LLP (Kermit W. Almstedt), Washington, D.C., for plaintiff Altos Hornos de Mexico, S.A. de C.V.; LeBoeuf, Lamb, Greene & MacRae, LLP (Pierre F. de Ravel d'Esclapon, Mary Patricia Michel), New York, N.Y., for plaintiff A.G. der Dillinger Huttenwerke, (Melvin S. Schwechter), Washington, D.C., for plaintiff S.A. Forgess de Clabecq.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; A. David Lafer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Jeffrey M. Telep, Marc E. Montalbine );

Stephen J. Powell, Chief Counsel (John D. McInerney, Elizabeth C. Seastrum, Robert E. Nielsen, Terrence J. McCartin, David W. Richardson, Marguerite Trossevin, David J. Ross), Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, Washington, D.C., for defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (John J. Mangan, Stephen Narkin, Robert E. Lighthizer, D. Scott Nance, Barry J. Gilman), Washington, D.C., for defendant-intervenors Domestic Producers; Dewey Ballantine, LLP (Alan Wm. Wolff, Michael H. Stein, John A. Ragosta, Martha J. Talley, Jeffrey D. Neuchterlein, John R. Magnus, Philip Karter, O. Julia Weller, Scott L. Forseth, Dominic L. Bianchi, Guy C. Smith, Michael R. Geroe), Washington, D.C., for defendant-intervenors Domestic Producers.

## OPINION

CARMAN, Chief Judge:

This case comes before the Court on remand from the United States Court of Appeals for the Federal Circuit (Federal Circuit). *See British Steel PLC v. United States,* 127 F.3d 1471 (Fed.Cir.1997) (*British Steel III* ). The Federal Circuit requests this Court to determine whether the United States Department of Commerce (Commerce) accurately applied its repayment methodology in the final determinations published in 1993 concerning certain steel products from various countries, including Brazil, Mexico, and the United Kingdom. *See id.* at 1475. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1988).

## BACKGROUND

In 1993, the Department of Commerce published its final determination in the countervailing duty investigations of certain steel products from a variety of countries, including Brazil, Mexico, and the United Kingdom. *See Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (Dep't Comm.1993) (final determ.); *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Mexico,* 58 Fed. Reg. 37,352 (Dep't Comm.1993) (final de-term.); *Final Affirmative Countervailing Duty Determination: Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,-393 (Dep't Comm.1993) (final determ.) (collectively *General Determinations* ). Commerce determined, among other things, that before Usinas Siderurgicas de Minas Gerais, S.A. (USIMINAS), Altos Hornos de Mexico, S.A. de C.V. (AHMSA), and British Steel (BS) were privatized, each company received past non-recurring subsidies from the governments of Brazil, Mexico, and the United Kingdom, respectively. In each case, Commerce examined whether it could continue to consider the privatized company a recipient of a subsidy under the countervailing duty statute, 19 U.S.C. § 1671(a) (1988), or whether the privatization effectively repaid the subsidies.

Commerce determined the "privatization of a government-owned company, *per se,* does not and cannot eliminate [the] countervailability" of a subsidy provided before privatization, except to the extent the sales price included the subsidy repayment. *See General Issues Appendix* appended to *Final Affirmative Countervailing Duty Determination: Certain Steel Products from Austria,* 58 Fed. Reg. 37,225, 37,263 (Dep't Comm.1993) (final determ.) (*General Issues Appendix* ). Commerce also developed an approach to determine the amount of past nonrecurring subsidies each privatization transaction repaid. *See id.* at 37,263. The repayment approach requires Commerce to determine what percentage of the company's net worth is attributable to a past non-recurring subsidy and allocates a portion of the company's purchase price to the repayment of the subsidy. *See id.*

In February 1995, this Court rejected Commerce's determination that subsequent to any privatization transaction Commerce may countervail a privatized company for pre-privatization subsidies regardless of how privatization occurs. *See British Steel plc v. United States,* 879 F.Supp. 1254, 1276 (CIT 1995) (*British Steel I* ). The Court reasoned the focus should be whether the entity that received the subsidy survived the privatization. *See id.* at 1271–74. The Court remanded the case, instructing Commerce to

determine, among other things, whether each transaction was an asset or stock sale, whether each privatization was conducted at arm's length for fair market value and based on commercial considerations, and whether the privatized entity continued to be, for all intents and purposes, the same entity that received subsidies prior to the privatization. *See id.* at 1276–77, 1329.

Applying this new standard, Commerce determined on remand it could properly countervail the full amount of subsidies received by BS, AHMSA, and USIMINAS prior to privatization. *See British Steel plc v. United States,* 924 F.Supp. 139, 149 (CIT 1996) (*British Steel II* ). This Court sustained the remand determinations, finding them to be supported by substantial evidence and otherwise in accordance with law. *See id.* at 190–91.

On appeal, the Federal Circuit reversed this Court's sustaining of Commerce's remand determinations based upon this Court's standard for calculating past non-recurring subsidies as identified in *British Steel I. See British Steel III,* 127 F.3d at 1475. In remanding the case to this Court, the Federal Circuit stated, "[i]n *British Steel I,* the Court of International Trade did not give proper deference to Commerce's repayment methodology. Instead ..., the court impermissibly imposed its own interpretation of the statute by formulating an alternative test. The Court erred in *British Steel II,* therefore, in sustaining Commerce's application of this alternative test." *British Steel III,* 127 F.3d at 1475. The Federal Circuit then instructed this Court on remand to "determine whether Commerce *accurately applied* its repayment methodology to the privatizations." *Id.* (emphasis added).

CONTENTIONS OF THE PARTIES

A. *Plaintiffs*

Plaintiffs, Foreign Producers, argue the specific methodology[1] adopted and applied to the privatization of certain foreign steel companies is arbitrary and capricious, bearing no rational relationship to the stated purpose of determining the portion of the purchase price paid for the privatized company that reasonably reflects the value of the company that is attributable to past subsidies. Plaintiffs argue Commerce's flawed methodology is due in part to Commerce's failure to provide the parties an opportunity to comment on the equations prior to implementation in alleged violation of Commerce's duty under the Administrative Procedure Act, 5 U.S.C. §§ 551–570 (1994).

Specifically, plaintiffs question the merit of using ratios for years dating back to 1977 to determine the value at the time of privatization of subsidies received by a company. Plaintiffs also argue treating subsidies received in one year as being relevant to a company only in that year is at odds with Commerce's view that the effects of non-recurring subsidies last for fifteen years. Further, plaintiffs argue using a simple average of the annual subsidy ratios to produce an estimate of the subsidy portion of the privatized company's net worth produces a downwardly-biased figure for the amount of repayment credit provided for those subsidies. Instead, plaintiffs suggest, Commerce's amortization approach would have been preferable.

B. *Defendant*

Defendant, the United States, argues, among other things, Commerce reasonably determined a portion of the sale price that private parties paid to the respective governments for the subsidized companies constituted repayment of some of those past subsidies. Defendant further argues Commerce's subsidy to net worth ratio approach reasonably reflects the value of prior subsidies allocated to the privatized companies upon their sale to private parties.

Specifically, defendant contends the subsidy to net worth ratio used for the fifteen year period was necessary to avoid anomalous results which would have occurred were Commerce to base its repayment methodolo-

---

**1.** Plaintiffs use the term "methodology" in referring to the equations developed by Commerce to determine the portion of the privatization price that constitutes payment for past subsidies. This Court examines these equations to determine the accuracy of Commerce's repayment methodology.

gy on data for a single year. Defendant additionally argues Commerce used the subsidy to net worth ratio to provide it with a tangible estimate of the contribution subsides have made to the value of the company, and the use of allocated amounts advocated by respondents would not necessarily provide a better estimate. Further, defendant argues, Commerce used the simple average not to produce a downwardly-biased effect but rather to avoid tracing the use of subsidies. Thus, defendant asserts, Commerce's repayment approach should be sustained.

### C. Defendant–Intervenors

Defendant–Intervenors, Domestic Producers, argue the approach developed by Commerce to apply its repayment methodology should not be affirmed.[2] Defendant–Intervenors contend, among other things, the approach adopted by Commerce was inconsistent with the statute, based on an unreasonable interpretation of the statute, and inconsistent with other fundamental countervailing duty principles. Specifically, defendant-intervenors contend Commerce may countervail partially amortized subsidies, notwithstanding an arm's length privatization. Defendant–Intervenors reason the benefits to production, which, they argue, are what the statute addresses, are unaffected by the payment of a fair purchase price. Thus, according to defendant-intervenors, unamortized benefits are subject to countervailing duties by Commerce even subsequent to a change in ownership where, after privatization, production remains unchanged, the financial structure remains unchanged, and economic conditions remain unchanged.

Defendant–Intervenors additionally argue the actual components of the repayment methodology[3] are economically indefensible and yield inconsistent and absurd results. First, defendant-intervenors argue the components of the repayment methodology are without any economic or accounting basis because the approach focuses on the ratio of subsidies to company book value over a given period even though there is no cognizable relationship between the value of the subsidies received and the book value of the company. Moreover, defendant-intervenors argue the market value of the company at the time of privatization is not merely a reflection of the simple average of the ratios of subsidy value to book value for the years in question, as many factors, including factors external to the corporation, influence the market value of the company.

Second, defendant-intervenors argue Commerce's approach yields inconsistent results as the approach treats similarly situated companies differently. Such a situation would occur, for example, where two corporations receive the same value of subsidies but one corporation is successful, thereby increasing its net worth, while the other is unsuccessful, thereby decreasing its net worth. Defendant-intervenors argue the approach taken by Commerce would allow the former corporation to receive greater repayment credit than the latter. Thus, two similarly situated corporations would be treated differently under Commerce's approach.

### STANDARD OF REVIEW

 This Court will sustain the equations developed by Commerce to apply its repayment methodology unless the approach is not supported by substantial evidence on the record and is not otherwise in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(i) (1988). In determining whether Commerce's approach is in accordance with law, this Court applies the two-step analysis articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Chevron requires the reviewing court to give effect to the intent of Congress

---

**2.** To the extent the Defendant–Intervenors appear to be challenging the underlying theory that subsidies can survive privatization and therefore remain potentially countervailable, the issue has already been decided by the Federal Circuit, see British Steel III, 127 F.3d 1471, and will not be further addressed in this opinion.

**3.** Defendant–Intervenors use the term "methodology" in referring to the equations developed by Commerce to determine the portion of the privatization price that constitutes payment for past subsidies. This Court examines these equations to determine the accuracy of Commerce's repayment methodology.

if Congress has directly spoken to the precise question at issue and Congress's intent is clear. *See id.* If, as here, however, Congress has not spoken directly to the issue at bar, the question for the court is whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In reviewing Commerce's interpretation, this Court " 'may reject ... that [which] contravenes clearly discernible legislative intent,' but '[the Court's] role when that intent is not contravened is to determine whether the agency's interpretation is "sufficiently reasonable." ' " *Grupo Industrial Camesa v. United States*, 853 F.Supp. 440, 442 (CIT 1994)(quoting *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986) (citations omitted)).

■ The Court need not conclude Commerce's construction is the only interpretation the agency could have adopted, or even the interpretation the Court would have reached if the question initially had arisen in a judicial proceeding before it. *See Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782. Rather, the focus of the inquiry is whether Commerce's interpretation of the statute is sufficiently reasonable to be accepted by the Court. *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).

## DISCUSSION

■ The countervailing duty statute provides, in relevant part, a duty shall be assessed if (1) a subsidy[4] is provided, directly or indirectly, "with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold ... for importation, into the United States"; and (2) a domestic industry is materially injured or threatened with material injury by reason of imports into the United States of that class or kind of merchandise. 19 U.S.C. § 1671(a)

(1988). The statute does not define, however, the amount of duty to be imposed but rather states Commerce "shall [ ] impose[ ] upon such merchandise a countervailing duty ... equal to the amount of the net subsidy." 19 U.S.C. § 1671(a)(1988).

Commerce and this Court agree the statutory authority governing countervailing duties does not speak directly to the amount of countervailing duties to be imposed on privatized corporations that received subsidies prior to privatization nor to what proportion of the purchase price of a privatized corporation should be attributed to prior subsidies. *See British Steel I*, 879 F.Supp. at 1271; *see also General Issues Appendix*, 58 Fed.Reg. at 37,263. This Court must, therefore, apply the *Chevron* reasonableness standard in deciding the legality of Commerce's determination.

Specifically, the Federal Circuit directed this Court to "determine whether Commerce accurately applied its repayment methodology to the privatizations." *British Steel III*, 127 F.3d at 1475. In determining whether Commerce accurately applied its repayment methodology, this Court examines whether the equations Commerce developed to identify the percentage of the subsidized company's net worth attributable to past non-recurring subsidies and to allocate a portion of the company's purchase price to subsidy repayment are reasonable.

In determining whether a privatized company could be considered a recipient of a subsidy under the countervailing duty statute, Commerce found, "privatization of a government-owned company, *per se*, does not and cannot eliminate [the] countervailability" of a subsidy provided to the company prior to privatization. *See General Issues Appendix*, 58 Fed.Reg. at 37,263. Based upon this determination, Commerce developed a repay-

---

**4.** The statute defines "subsidy" as having "the same meaning as the term 'bounty or grant' as that term is used in section 1303 [of 19 U.S.C]." The definition includes, but is not limited to, domestic subsidies such as "[t]he provision of capital, loans, or loan guarantees ... [t]he provision of goods or services at preferential rates ... [t]he grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry ... [and] the assumption of any costs or expenses of manufacture, production, or distribution." 19 U.S.C. § 1677(5)(A)(1988). The statutory coverage is limited to domestic subsidies that are "provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise." 19 U.S.C. § 1677(5)(A)(ii)(1988).

ment approach to measure the amount of the past non-recurring subsidies that the privatization transaction repaid. The approach determines what percentage of a subsidized company's net worth is attributable to past non-recurring subsidies and allocates, based on this percentage, a portion of the company's purchase price to subsidy repayment. To determine this percentage, Commerce calculates a subsidy ratio, identified by dividing the value of subsidies received by the net worth of the company for each year. Commerce then computes the simple average of the subsidy ratios for all years from 1977 (the earliest point at which subsidies with benefits remaining countervailable in this investigation could have been bestowed) through the year of privatization. This ratio is multiplied by the purchase price to determine the portion of the purchase price attributable to the repayment of prior subsidies. The resulting product is then applied as credit to offset the benefit streams of the prior subsidies.

The countervailing duty statute specifically states that Commerce must impose a duty "equal to the amount of the net subsidy." 19 U.S.C. § 1671(a)(1988). Commerce argues, and the statute, legislative history, and past case law suggest, the net subsidy at issue is the value of the subsidy received by the corporation at the time the subsidy was provided, without consideration of the use or effect of the subsidy on the recipient's subsequent performance. *See* Trade Agreements Act of 1979, 125 Cong. Rec. S20167 (July 23, 1979); *see also Michelin Tire Corporation v. United States*, 6 CIT 320, 328 (1983); *General Issues Appendix*, 58 Fed.Reg. at 37,260. Thus, the value of the subsidy initially provided is the focus of the countervailing duty statute.

This Court finds the equations developed by Commerce to identify the value of the net subsidy in its repayment methodology satisfy this statutory goal and are a reasonable interpretation of the countervailing duty statute. Commerce applies its equations as follows: first, Commerce identifies a relationship between the value of the subsidy to the value of the corporation in the year of receipt, thereby recognizing the full value of the subsidy with respect to the corporation's net value at the time the subsidy was provided. *See General Issues Appendix*, 58 Fed.Reg. at 37,263. Second, Commerce takes the average of these proportions over the time period in which the benefits remaining countervailable could have been bestowed, representing the benefit of the initial subsidies over time.[5] *See id.* Finally, Commerce discounts the purchase price by that ratio, thereby crediting a portion of the purchase price to the repayment of subsidies provided prior to privatization. *See id.*

The equations developed by Commerce are a reasonable means for determining what portion of the purchase price of a privatized corporation should be attributed to prior subsidies. Precedent recognizes that a subsidy may pass through to a privatized corporation, *see British Steel III*, 127 F.3d at 1475; *see also Saarstahl AG v. United States*, 78 F.3d 1539, 1544 (Fed.Cir.1996), suggesting some countervailable subsidies exist subsequent to privatization. Absent guidance by the countervailing duty statute, Commerce must, therefore, reasonably determine that proportion.

■ While the equations developed by Commerce may not necessarily reflect the exact amount of subsidies which remain countervailable after privatization[6] and the precise proportion of the purchase price attributable to prior subsidies, and indeed may

---

**5.** Legislative history suggests the reasonableness of the methodology adopted for allocating the value of the subsidies over the production and/or exportation of the products benefitting from the subsidies will necessarily differ depending upon the commercial and competitive benefits to the recipient of the subsidies. *See* S.Rep. No. 96–249, 96th Cong., First Sess. 85–6 (1979). Thus, if the non-recurring subsidy is used to purchase capital equipment that has immediate significant benefit to the corporation, it would be unreasonable to allocate the value of the subsidy over a twenty-year period. *See id.* Where, as here,

however, the subsidies provided are infusions of cash or rebates (e.g., grants, tax rebates) and the use of the subsidies is not readily identifiable in the record, *see, e.g., Final Affirmative Countervailing Duty Determinations: Certain Products from Brazil*, 58 Fed.Reg. 37,295 (Dep't Comm. 1993) (final determ.), it is reasonable for Commerce to average the value of the subsidies provided each year over a reasonable period of time.

**6.** For example, the calculation fails to realize the net worth in any given year is the cumulative

not be the same equations this Court would develop were it responsible for devising or selecting the equations [7], the equations are a reasonable interpretation of the countervailing duty statute. It is not this Court's role to challenge the wisdom of Commerce's policy, but rather to judge the reasonableness of the policy adopted. *See, e.g., Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793. As the equations developed by Commerce satisfy the statutory goal of identifying the value of the net subsidies initially provided and as the equations identify a relationship between the net subsidies over time and the value of the corporation at privatization, this Court finds the equations developed by Commerce to apply its repayment methodology are a reasonable interpretation of the statute and are otherwise in accordance with law.

## CONCLUSION

For the reasons stated above, the Court finds the equations developed by Commerce to apply its repayment methodology as set forth in the *General Issues Appendix* are a reasonable construction of the countervailing duty statute and are otherwise in accordance with law. Accordingly, this Court holds Commerce accurately applied its repayment methodology as set forth in the *General Issues Appendix* to the privatizations identified in Commerce's *General Determinations* and upholds Commerce's findings in the *General Determinations* where Commerce applies its equations in making the final determinations identified therein.

## JUDGMENT ORDER

This matter is before the Court on an order from the United States Court of Appeals for the Federal Circuit, *see British Steel PLC v. United States,* 127 F.3d 1471 (Fed.Cir.1997), affirming in part and reversing in part this Court's decision in *British Steel PLC v. United States,* 924 F.Supp. 139 (CIT 1996). This Court, in light of the Federal Circuit's opinion and after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that Commerce accurately applied its repayment methodology as set forth in the *General Issues Appendix* appended to *Final Affirmative Countervailing Duty Determination: Certain Steel Products from Austria,* 58 Fed. Reg. 37,225, 37,259–73 (Dep't Comm.1993)(final determ.) to the privatizations identified in *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Brazil,* 58 Fed. Reg. 37,295 (Dep't Comm.1993)(final determ.), *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Mexico,* 58 Fed. Reg. 37,352 (Dep't Comm.1993)(final determ.), and *Final Affirmative Countervailing Duty Determination: Certain Steel Products from the United Kingdom,* 58 Fed. Reg. 37,393 (Dep't Comm.1993)(final determ.)(collectively *General Determinations* ), and it is further

**ORDERED** that Commerce's findings in the *General Determinations* where Commerce applies its equations in making the final determinations identified therein are hereby sustained.

total of results of past years, giving such calculations an underestimation of the subsidy credit. *See Respondents' Joint Brief in Support of Their Motion for Partial Judgment on the Agency Record on the General Issue of Privatization and Restructuring,* at 84–85.

7. While this Court has previously expressed concerns regarding the reasonableness of Commerce's interpretation of the countervailing duty statute as it applies to privatization, *see British Steel I,* 879 F.Supp. at 1271, the reasoning upon which the Court based its concerns lacked the benefit of the Federal Circuit's decisions in *Saarstahl v. United States,* 78 F.3d 1539 (Fed.Cir. 1996), and *Inland Steel Bar Co. v. United States,* 86 F.3d 1174, 1996 WL 168937 (Fed.Cir.1996).

In *Saarstahl,* the Federal Circuit determined Commerce correctly recognized the purchase price paid by private companies to acquire a previously government-owned and subsidized entity might reflect a partial repayment of prior subsidies, suggesting some portion of the previously bestowed subsidies remained countervailable. *See Saarstahl,* 78 F.3d at 1544. A similar determination by Commerce was subsequently upheld in *Inland Steel. See Inland Steel,* 86 F.3d 1174 (applying the reasoning in *Saarstahl* to uphold Commerce's determination "previously bestowed subsidies are passed through to a successor company sold in an arm's length transaction").